DIANA GRIBBON MOTZ, Circuit Judge:
 

 Joseph Decore Simms was convicted of brandishing a firearm in connection with a "crime of violence," as defined in
 
 18 U.S.C. § 924
 
 (c)(3)(B). He appeals, contending that § 924(c)(3)(B), as long understood, is unconstitutionally vague. The Government concedes this point but urges us to abandon the settled meaning of the statute and employ a new definition of "crime of violence."
 

 We cannot do so. Neither the statutory language nor controlling precedent offer any support for the Government's proposed reinterpretation. Rather, the text and structure of § 924(c)(3)(B) plainly set forth a definition of "crime of violence" that fails to comport with due process. Accordingly, we reverse and remand for further proceedings consistent with this opinion.
 

 I.
 

 This case arises from an April 2014 conspiracy to rob a McDonald's in Goldsboro, North Carolina. Shortly after 1:00 a.m., Simms and a co-conspirator crawled into the McDonald's through the drive-through window; a third robber served as a lookout. When inside, Simms pointed a gun at the manager, attempted to strike another employee, and demanded money. The manager complied and opened the restaurant's safe. After removing the contents, Simms struck the manager with the gun, threw a cash drawer at the other employee, and fled with his two co-conspirators and $1,100.
 

 After his arrest and indictment, Simms pleaded guilty to Count I, conspiracy to commit Hobbs Act robbery in violation of
 
 18 U.S.C. § 1951
 
 , and Count II, brandishing a firearm during and in relation to a "crime of violence"-that is, the Hobbs Act conspiracy in Count I-in violation of
 
 18 U.S.C. § 924
 
 (c)(1)(A). But at sentencing, Simms argued that his conviction under Count II was unconstitutional in light of
 
 Johnson v. United States
 
 , --- U.S. ----,
 
 135 S.Ct. 2551
 
 ,
 
 192 L.Ed.2d 569
 
 (2015). He contended that Hobbs Act conspiracy was not a "crime of violence" because the definition of this term in
 
 18 U.S.C. § 924
 
 (c)(3)(B) was unconstitutionally vague, like the similar definition of "violent felony" that the Supreme Court struck down in
 
 Johnson
 
 . The district court rejected this argument and sentenced Simms to 115 months' incarceration on Count I and 84 months on Count II, for a total consecutive sentence of 199 months' imprisonment.
 

 Simms appealed, again contending that his conviction under Count II could not stand because § 924(c)(3)(B) was unconstitutional.
 
 [1]
 
 After the parties briefed and argued the appeal before a panel of this court, the Supreme Court struck down as unconstitutionally vague a statute containing language materially identical to that challenged by Simms.
 
 See
 

 Sessions v. Dimaya
 
 , --- U.S. ----,
 
 138 S.Ct. 1204
 
 , 1223,
 
 200 L.Ed.2d 549
 
 (2018). Given the exceptional importance and recurring nature of the question presented here, we agreed to rehear the case en banc. For the reasons that follow, we now reverse.
 

 II.
 

 We must determine whether the definition of "crime of violence" in § 924(c)(3)(B) satisfies the requirements of due process.
 

 In resolving this question, we first set forth the statutory framework and examine Supreme Court precedent interpreting text materially identical to that at issue here. We then address the contours of Simms's constitutional challenge, drawing on the Supreme Court's consideration of identical challenges to similar statutory language. Finally, we explain why, in light of the plain text and binding Supreme Court precedent, we must hold § 924(c)(3)(B) unconstitutional.
 

 A.
 

 Federal law, as codified at
 
 18 U.S.C. § 924
 
 (c)(1)(A), provides that a person who uses or carries a firearm "during and in relation to any crime of violence" or who "possesses a firearm" "in furtherance of any such crime" may be convicted of
 
 both
 
 the underlying crime (here, Hobbs Act conspiracy)
 
 and
 
 the additional, distinct crime of utilizing a firearm in connection with a "crime of violence," with the latter punishable by at least five consecutive years of imprisonment.
 

 Section 924(c)(3) defines "crime of violence" as "an offense that is a felony" and
 

 (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
 

 (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.
 

 18 U.S.C. § 924
 
 (c)(3). Courts commonly refer to § 924(c)(3)(A) as the "force clause" and to § 924(c)(3)(B), the provision at issue here, as the "residual clause." For Simms's § 924(c) conviction to stand, his Hobbs Act conspiracy offense must constitute a "crime of violence" under one of these two definitions.
 

 Our analysis begins with the force clause, § 924(c)(3)(A). To determine whether an offense is a crime of violence under that clause, courts use an inquiry known as the "categorical" approach. They look to whether the statutory elements of the offense necessarily require the use, attempted use, or threatened use of physical force.
 
 See, e.g.
 
 ,
 
 Leocal v. Ashcroft
 
 ,
 
 543 U.S. 1
 
 , 7-10,
 
 125 S.Ct. 377
 
 ,
 
 160 L.Ed.2d 271
 
 (2004) (interpreting materially identical text in
 
 18 U.S.C. § 16
 
 (a) );
 
 United States v. McNeal
 
 ,
 
 818 F.3d 141
 
 , 151-52 (4th Cir. 2016) (interpreting § 924(c)(3)(A) ). This approach is "categorical" because courts consider only the crime as defined, not the particular facts in the case.
 
 See, e.g.
 
 ,
 
 McNeal
 
 ,
 
 818 F.3d at 152
 
 . To be more precise, we will refer to the force clause inquiry as the
 
 elements-based
 
 categorical approach, because it begins and ends with the offense's elements. When a statute defines an offense in a way that allows for both violent and nonviolent means of commission, that offense is not "categorically" a crime of violence under the force clause.
 

 Simms's offense-conspiracy to commit Hobbs Act robbery-does not categorically qualify as a crime of violence under the elements-based categorical approach, as the United States now concedes. Gov. 28(j) Letter at 1, ECF No. 44 (Oct. 19, 2016); Simms Suppl. Br. at 1. This is so because to convict a defendant of this offense, the Government must prove only that the defendant
 agreed with another to commit actions that, if realized, would violate the Hobbs Act. Such an agreement does not invariably require the actual, attempted, or threatened use of physical force.
 

 Accordingly, the only way we can sustain Simms's conviction on Count II is if his commission of Hobbs Act conspiracy constitutes a crime of violence under the residual clause-that is, if we determine that he committed a felony offense "that by its nature[ ] involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."
 
 18 U.S.C. § 924
 
 (c)(3)(B). Interpreting a materially identical clause in another statute, the Supreme Court has directed courts to employ a categorical approach that-as with the force clause-"look[s] to the elements and the nature of the offense of conviction, rather than to the particular facts."
 
 Leocal
 
 ,
 
 543 U.S. at 7
 
 ,
 
 125 S.Ct. 377
 
 (interpreting
 
 18 U.S.C. § 16
 
 (b) to "require[ ]" categorical analysis);
 
 see also
 

 United States v. Aragon
 
 ,
 
 983 F.2d 1306
 
 , 1312-13 (4th Cir. 1993) ("conclud[ing] that the plain language of § 16(b) mandates that the court embark upon a categorical approach").
 
 [2]
 

 Importantly, however, the analysis applicable to the residual clause constitutes a "distinctive form" of the categorical approach.
 
 Dimaya
 
 ,
 
 138 S.Ct. at 1211
 
 (interpreting § 16(b) ). Unlike the elements-based categorical approach of the force clause, the residual clause inquiry "goes beyond deciding whether creation of risk is an element of the crime."
 
 Johnson
 
 ,
 
 135 S.Ct. at 2557
 
 (interpreting
 
 18 U.S.C. § 924
 
 (e)(2)(B)(ii) ). Under the residual clause, courts must use the statutory definition of an offense to imagine its "ordinary case," and then consider whether this imagined ordinary case entails a "substantial risk" of force.
 
 Dimaya
 
 ,
 
 138 S.Ct. at 1211
 
 (internal quotation marks omitted);
 
 see also
 

 18 U.S.C. § 924
 
 (c)(3)(B).
 

 We call the analysis applicable to the residual clause the
 
 ordinary-case
 
 categorical approach. This ordinary-case categorical approach is "broader than" the elements-based categorical approach applicable to the force clause, "in the sense that force need not actually be applied" in a residual clause offense.
 
 Leocal
 
 ,
 
 543 U.S. at 11
 
 ,
 
 125 S.Ct. 377
 
 .
 

 B.
 

 Simms contends that conspiracy to commit Hobbs Act robbery does not constitute a crime of violence under the residual clause, § 924(c)(3)(B), because that clause-like the similarly worded residual clauses analyzed in
 
 Johnson
 
 , --- U.S. ----,
 
 135 S.Ct. 2551
 
 , and
 
 Dimaya
 
 , --- U.S. ----,
 
 138 S.Ct. 1204
 
 -is void for vagueness.
 

 As Justice Kagan explained in
 
 Dimaya
 
 , " '[t]he prohibition of vagueness in criminal statutes' ... is an 'essential' of due process, required by both 'ordinary notions of fair play and the settled rules of law.' "
 
 138 S.Ct. at 1212
 
 (plurality opinion) (quoting
 
 Johnson
 
 ,
 
 135 S.Ct. at
 
 2557 ). Vague criminal statutes "invite the exercise of arbitrary power ... by leaving people in the
 dark about what the law demands and allowing prosecutors and courts to make it up."
 
 Id.
 
 at 1223-24 (Gorsuch, J., concurring in part and concurring in the judgment). The void-for-vagueness doctrine thus ensures citizens have fair notice of prohibited conduct, guards against discriminatory enforcement of ambiguous laws, and respects the foundational principle that only Congress-not the executive or the courts-is empowered to establish the bounds of proscribed conduct.
 
 Id.
 
 at 1212 (plurality opinion).
 

 In
 
 Johnson
 
 , the Supreme Court struck down the residual clause of the Armed Career Criminal Act ("ACCA") as void for vagueness.
 
 135 S.Ct. at 2557
 
 . ACCA enhances the sentence of those convicted of possessing a firearm in violation of
 
 18 U.S.C. § 922
 
 (g) if they have three or more prior convictions for a "serious drug offense" or for a "violent felony." It defines "violent felony" as any felony that:
 

 (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
 

 (ii) is burglary, arson, or extortion, involves use of explosives, or
 
 otherwise involves conduct that presents a serious potential risk of physical injury to another
 
 ....
 

 18 U.S.C. § 924
 
 (e)(2)(B) (emphasis added). The italicized portion is the ACCA residual clause.
 
 Johnson
 
 ,
 
 135 S.Ct. at 2555-56
 
 .
 

 The
 
 Johnson
 
 Court explained that "[t]wo features of the [ACCA] residual clause conspire[d] to make it unconstitutionally vague."
 

 Id.
 

 at 2557
 
 . The clause left uncertainty about both (1) "how to estimate the risk posed by a crime," and (2) "how much risk it takes for a crime to qualify as a violent felony."
 

 Id.
 

 at 2557-58
 
 .
 

 The first problem arose because the residual clause "tie[d] the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements," but "offer[ed] no reliable way" for judges to ascertain what the "ordinary case" involved.
 

 Id.
 

 Regarding the second problem, the Court clarified that it was "one thing to apply an imprecise 'serious potential risk' standard to real-world facts," but "quite another to apply it to a judge-imagined abstraction," as the ACCA residual clause required.
 

 Id.
 

 at 2558
 
 . The Court held that the combination of these two flaws rendered the ACCA residual clause unconstitutional: "Each of the uncertainties in the residual clause may be tolerable in isolation, but 'their sum makes a task for us which at best could be only guesswork.' "
 

 Id.
 

 at 2560
 
 (quoting
 
 United States v. Evans
 
 ,
 
 333 U.S. 483
 
 , 495,
 
 68 S.Ct. 634
 
 ,
 
 92 L.Ed. 823
 
 (1948) ).
 

 The Supreme Court reiterated this logic in
 
 Dimaya
 
 , when it held
 
 18 U.S.C. § 16
 
 (b) unconstitutionally vague.
 
 138 S.Ct. at 1215-16
 
 . That statute defines "crime of violence," a term incorporated into many criminal and immigration statutes, as:
 

 (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
 

 (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.
 

 18 U.S.C. § 16
 
 . Section 16(b) is similarly known as the "residual clause."
 
 Dimaya
 
 ,
 
 138 S.Ct. at 1212
 
 .
 

 In
 
 Dimaya
 
 , the Court held that a "straightforward application" of
 
 Johnson
 
 made clear that § 16(b), like the ACCA residual clause, was void for vagueness.
 
 Id
 
 . at 1213. In doing so, the Court carefully explained that the proper ordinary-case categorical analysis did not ask "whether 'the particular facts' underlying a conviction
 posed the substantial risk that § 16(b) demands," nor whether "the statutory elements of a crime require (or entail) the creation of such a risk in each case that the crime covers."
 

 Id.
 

 at 1211
 
 (quoting
 
 Leocal
 
 ,
 
 543 U.S. at 7
 
 ,
 
 125 S.Ct. 377
 
 ). Rather, a majority of the Court agreed that " § 16(b) requires a court to ask whether the ordinary case of an offense poses the requisite risk."
 

 Id.
 

 (internal quotation marks omitted);
 
 see also
 

 id.
 
 at 1235 (Roberts, C.J., dissenting) (identifying ordinary-case categorical approach as the way "courts should assess whether a particular crime 'by its nature' involves a risk of the use of physical force").
 

 As a result, § 16(b) possessed "the same two features that conspired to make ACCA's residual clause unconstitutionally vague."
 
 Id.
 
 at 1216 (majority opinion) (alterations and internal quotation marks omitted) (quoting
 
 Johnson
 
 ,
 
 135 S.Ct. at
 
 2557 ). As with the ACCA residual clause, § 16(b) required courts to "identify a crime's 'ordinary case' in order to measure the crime's risk."
 
 Id.
 
 at 1215. But the statute failed to provide any guidance on how to "divin[e] the conduct entailed in a crime's ordinary case."
 
 Id.
 
 "And § 16(b) also possesse[d] the second fatal feature of ACCA's residual clause: uncertainty about the level of risk that ma[de] a crime 'violent.' "
 
 Id.
 
 Thus, like the ACCA residual clause, the Court held that § 16(b) violated due process.
 
 Id.
 
 at 1223.
 

 C.
 

 With these precedents in mind, we turn to the question at hand: is the materially identical statute at issue here also unconstitutionally vague?
 

 Like the statutes examined in
 
 Johnson
 
 and
 
 Dimaya
 
 , § 924(c)(3)(B) requires a court to imagine the idealized ordinary case of a crime while providing no guidance on how to do so, rendering any judicial account of the ordinary case wholly speculative.
 
 Dimaya
 
 ,
 
 138 S.Ct. at
 
 1213-14 ;
 
 Johnson
 
 ,
 
 135 S.Ct. at 2557-58
 
 . After conceiving of this judicial abstraction, a court must then assess its speculation using the same vague standard of "substantial risk" as § 16(b) required in
 
 Dimaya
 
 .
 
 138 S.Ct. at 1214
 
 . This conjectural exercise suffers from the same two fundamental flaws that, in combination, rendered the statutory provisions in
 
 Johnson
 
 and
 
 Dimaya
 
 void for vagueness.
 
 Dimaya
 
 ,
 
 138 S.Ct. at
 
 1213-16 ;
 
 Johnson
 
 ,
 
 135 S.Ct. at 2557-58
 
 .
 

 Section 924(c)(3)(B) is therefore unconstitutional. Three other circuits have reached this conclusion.
 
 United States v. Davis
 
 ,
 
 903 F.3d 483
 
 , 485-86 (5th Cir. 2018) (per curiam),
 
 cert. granted
 
 , --- U.S. ----, --- S.Ct. ----, --- L.Ed.2d ----,
 
 2019 WL 98544
 
 (U.S. Jan. 4, 2019) (No. 18-431) ;
 
 United States v. Eshetu
 
 ,
 
 898 F.3d 36
 
 , 37 (D.C. Cir. 2018) (per curiam),
 
 petition for reh'g en banc filed
 
 , No. 15-3020 (Aug. 31, 2018);
 
 United States v. Salas
 
 ,
 
 889 F.3d 681
 
 , 684-86 (10th Cir. 2018),
 
 petition for cert. filed
 
 , No. 18-428 (U.S. Oct. 3, 2018).
 
 [3]
 

 To understand why, consider a situation where a defendant is charged with possessing a gun in conjunction with witness tampering.
 
 See
 

 18 U.S.C. § 1512
 
 (b) ;
 
 Dimaya
 
 ,
 
 138 S.Ct. at 1232
 
 (Gorsuch, J., concurring in part and concurring in the judgment). As the Supreme Court has explained, § 924(c)"requires the prosecution to make two showings": the commission of an underlying crime and the use of a firearm.
 
 Smith v. United States
 
 ,
 
 508 U.S. 223
 
 , 227-28,
 
 113 S.Ct. 2050
 
 ,
 
 124 L.Ed.2d 138
 
 (1993) ;
 
 see also
 

 Rosemond v. United States
 
 ,
 
 572 U.S. 65
 
 , 75,
 
 134 S.Ct. 1240
 
 ,
 
 188 L.Ed.2d 248
 
 (2014) (" § 924(c)... punishes the temporal and relational conjunction of two separate acts, on the ground that together they pose an extreme risk of harm.").
 

 Thus, to evaluate whether witness tampering satisfies the "crime of violence" element of a § 924(c) violation, a court must assess whether the ordinary case of witness tampering, with or without a firearm, "involves a substantial risk [of] physical force."
 
 18 U.S.C. § 924
 
 (c)(3)(B). And when "divining the conduct entailed in [the] crime's ordinary case," the court must utilize some as-yet-unspecified method-"Surveys? Experts? Google? Gut instinct?"
 
 Dimaya
 
 ,
 
 138 S.Ct. at 1215
 
 (majority opinion) (citing
 
 Johnson
 
 ,
 
 135 S.Ct. at
 
 2557 ). The statute provides no guidance for this "abstract inquiry."
 
 See
 

 Dimaya
 
 ,
 
 138 S.Ct. at 1215
 
 (quoting
 
 Johnson
 
 ,
 
 135 S.Ct. at
 
 2561 ). Instead, § 924(c)(3)(B) effectively requires judges to define the scope of criminal liability, and it directs them to do so using an unmoored, subjective abstraction that deprives the public of fair notice.
 

 Just as in
 
 Dimaya
 
 , a "straightforward application" of controlling precedent to the challenged statute requires us to strike it down.
 
 Dimaya
 
 ,
 
 138 S.Ct. at 1213
 
 . The Supreme Court has made clear that where a statute requires courts to assess "both an ordinary-case requirement and an ill-defined risk threshold," it is unconstitutional.
 

 Id.
 

 at 1223 ;
 
 see also
 

 Johnson
 
 ,
 
 135 S.Ct. at 2557-60
 
 . That principle controls here. Any conviction involving § 924(c)(3)(B) is subject to the same "guesswork," "intuition," "arbitrary enforcement," and lack of "fair notice" that plagued both § 16(b) and the ACCA residual clause.
 
 Dimaya
 
 ,
 
 138 S.Ct. at 1223
 
 (quoting
 
 Johnson
 
 ,
 
 135 S.Ct. at
 
 2557-59 ). Because this "produces more unpredictability and arbitrariness than the Due Process Clause tolerates,"
 

 id.
 

 (quoting
 
 Johnson
 
 ,
 
 135 S.Ct. at
 
 2558 ), we must conclude that § 924(c)(3)(B) is unconstitutionally vague.
 

 III.
 

 The United States concedes that if we adhere to the ordinary-case categorical approach applied by the Supreme Court in
 
 Leocal
 
 ,
 
 Johnson
 
 , and
 
 Dimaya
 
 , we must invalidate § 924(c)(3)(B). The Government, however, urges us to jettison this established interpretation and adopt a new reading of the challenged statutory language that employs a conduct-specific approach to the crime of violence analysis. This conduct-specific approach would consider the facts of each individual case, rather than the statutory definition of the underlying offense.
 

 Before addressing the merits of the Government's claim, we must determine whether to allow it to raise an argument that it previously abandoned. Although the Government initially argued in the alternative that a conduct-specific interpretation of § 924(c)(3)(B) was tenable, Gov. Br. at 28-31, it later expressly disclaimed this reading of § 924(c)(3)(B). The Government did so by submitting to us a written statement that "the position of the United States [is] that the categorical approach is the proper interpretation of the
 statute, and it is wholly unaffected by
 
 Johnson
 
 ." Gov. 28(j) Letter at 2 (Oct. 19, 2016). After the Supreme Court decided
 
 Dimaya
 
 and we ordered supplemental briefing, the Government again reversed course, deeming a conduct-specific reading of § 924(c)(3)(B) freshly controlling. Given these changing stances, Simms asserts that the Government has forfeited any argument for a conduct-specific approach.
 
 [4]
 

 The Government offers two reasons why we should excuse its voluntary withdrawal of a conduct-specific interpretation of § 924(c)(3)(B). First, it argues that
 
 Dimaya
 
 represented "an intervening change in the law recognizing an issue that was not previously available."
 
 United States v. Chittenden
 
 ,
 
 896 F.3d 633
 
 , 639 (4th Cir. 2018) (internal quotation marks omitted). At oral argument, the Government elaborated that the longstanding position of the United States that § 924(c)(3)(B) required an ordinary-case categorical approach came "more by way of assumption" than reason, and that
 
 Dimaya
 
 "caused a lot of searching in the Department [of Justice] to find the right answer." Oral Arg. at 1:27:41, 1:29:00.
 

 This claim does not hold water.
 
 Dimaya
 
 was not the first case to indicate that the ordinary-case categorical approach generated serious constitutional doubts. At the very least, the Government was on notice as to these vagueness concerns after
 
 Johnson
 
 was decided in 2015. Indeed, the Ninth Circuit held § 16(b) unconstitutionally vague four months later.
 
 See
 

 Dimaya v. Lynch
 
 ,
 
 803 F.3d 1110
 
 , 1120 (9th Cir. 2015),
 
 aff'd sub nom.
 

 Sessions v. Dimaya
 
 , --- U.S. ----,
 
 138 S.Ct. 1204
 
 ,
 
 200 L.Ed.2d 549
 
 (2018). But a full year thereafter, the Government asserted to us that "the categorical approach [was] the proper interpretation" of § 924(c)(3)(B) and that this conclusion was "wholly unaffected by
 
 Johnson
 
 ." Gov. 28(j) Letter at 2. The United States has yet to offer a coherent justification for its shifts in position, and its invocation of
 
 Dimaya
 
 offers no answer.
 

 The Government next asserts that excusing its abandonment would not prejudice Simms, who has had a full opportunity to respond to the Government's claims. That is certainly enough to convince us that we
 
 can
 
 look past the Government's change of heart,
 
 e.g.
 
 ,
 
 United States v. Ramos-Cruz
 
 ,
 
 667 F.3d 487
 
 , 496 n.5 (4th Cir. 2012), but not necessarily that we
 
 should
 
 do so. As the Government is aware, we routinely exercise our discretion in favor of a strict reading of forfeiture.
 
 See, e.g.
 
 ,
 
 United States v. Brown
 
 ,
 
 742 F. App'x 742
 
 , 745 n.3 (4th Cir. 2018) ("[W]e conclude that Brown waived the argument that
 
 18 U.S.C. § 924
 
 (c)(3)(B) (2012) is unconstitutional by failing to raise it in his opening brief.");
 
 United States v. Khoa Dang Hoang
 
 ,
 
 737 F. App'x 136
 
 , 138 n.* (4th Cir. 2018) (deeming forfeited defendant's challenge to validity of
 
 Miranda
 
 waiver);
 
 see also
 

 United States v. Cannon
 
 ,
 
 740 F. App'x 785
 
 , 791 n.2 (4th Cir. 2018) (deeming forfeited, at Government's suggestion, defendant's undeveloped sentencing challenges);
 
 United States v. Ballard
 
 ,
 
 727 F. App'x 757
 
 , 760 n.* (4th Cir. 2018) (same regarding
 defendant's statutory speedy trial claim).
 

 Nevertheless, in this case, we opt to proceed to the merits in view of the exceptional importance and recurring nature of the question presented. Particularly given the markedly effective presentation by the parties and the amici before the en banc court, we see no reason to defer adjudication of the Government's current argument.
 

 IV.
 

 The Government now contends that we must apply a different mode of analysis to § 924(c)(3)(B), a mode that the Supreme Court expressly rejected in both
 
 Dimaya
 
 and
 
 Johnson
 
 .
 

 Specifically, the Government insists that the best reading of the statute-which, recall, asks whether "an offense that is a felony ... by its nature[ ] involves a substantial risk that physical force ... may be used in the course of committing the offense"-directs a court to analyze an offender's specific conduct by diving into the facts before it instead of limiting the analysis to the offense's ordinary case. In support of this contention, the Government argues that "the Supreme Court has been very clear" that the categorical approach is "essentially a saving construction" designed only to avoid the risk of unfairness that comes with reviewing conduct that underlies long-past convictions. Oral Arg. at 1:19:05. Alternatively, the Government claims that even if a conduct-specific approach is not the best reading of § 924(c)(3)(B), we still must adopt it to avoid striking down the statute. Three of our sister circuits have embraced the Government's suggestion.
 
 [5]
 

 We cannot do so. The Supreme Court did not invent the categorical approach out of whole cloth, as the Government would have us believe. While some other statutes invoking categorical analysis have been less than clear, the text and structure of § 924(c)(3)(B) unambiguously require courts to analyze the attributes of an "offense that is a felony ... by its nature"-that is, categorically. And the Government's comparisons to cases involving very different statutes, rather than bolstering its preference for a new mode of analysis, support adherence to the established ordinary-case categorical approach.
 

 A.
 

 As a preliminary matter, the Government presents a flawed historical premise. It claims that the categorical approach is nothing more than a "saving construction," Oral Arg. at 1:19:05, "purely [a] judge-made doctrine" that was "first endorsed" less than thirty years ago, Gov. Supp. Br. at 17 (internal quotation marks omitted). Further, the Government asserts, this doctrine is grounded entirely in external considerations far afield from congressional language or intent.
 

 This is simply not so. Although categorical analysis may be complicated, the
 rationale for it is simple and long-established: if Congress has conditioned a statutory penalty on commission of an offense generally-rather than on specific acts-courts must consider the crime as defined, rather than the offender's conduct.
 
 See, e.g.
 
 ,
 
 Shepard v. United States
 
 ,
 
 544 U.S. 13
 
 , 19,
 
 125 S.Ct. 1254
 
 ,
 
 161 L.Ed.2d 205
 
 (2005) (emphasizing Congress's "language imposing the categorical approach" in ACCA);
 
 Leocal
 
 ,
 
 543 U.S. at 7
 
 ,
 
 125 S.Ct. 377
 
 (highlighting Congress's usage of "offense ... by its nature" in § 16(b) ). Such analysis became more frequent in the mid-1980s as Congress added general terms like "violent felony," "crime of violence," and "aggravated felony" to the United States Code, but the underlying principle is far from novel. Indeed, it has been an important part of American jurisprudence for more than a century.
 
 See, e.g.
 
 ,
 
 U.S. ex rel. Guarino v. Uhl
 
 ,
 
 107 F.2d 399
 
 , 400 (2d Cir. 1939) (L. Hand, J.) (explaining that "deporting officials may not consider the particular conduct for which the alien has been convicted" in determining whether a crime involved moral turpitude meriting deportation (citing
 
 U.S. ex rel. Mylius v. Uhl
 
 ,
 
 210 F. 860
 
 , 863 (2d Cir. 1914) ) ).
 

 Moreover, the Supreme Court has always rooted the categorical approach in the statutory language chosen by Congress and consistently defended this approach as a means of effectuating congressional intent. Thus, when analyzing ACCA four years after its passage, the Court looked first to "the language of" the statute, and only then to legislative history and practical concerns, to conclude that a categorical approach was "the only plausible interpretation of § 924(e)(2)(B)(ii)."
 
 Taylor v. United States
 
 ,
 
 495 U.S. 575
 
 , 600-02,
 
 110 S.Ct. 2143
 
 ,
 
 109 L.Ed.2d 607
 
 (1990). Similarly, when defending application of the ordinary-case categorical approach as it relates to ACCA's residual clause in 2015, the Court again began with the statutory text before considering other arguments.
 
 Johnson
 
 ,
 
 135 S.Ct. at 2562
 
 .
 

 The Supreme Court's interpretation of ACCA in
 
 Taylor
 
 and
 
 Johnson
 
 was, of course, secondarily informed by considerations beyond the statutory text. But tellingly, the Court has deemed the text of § 16(b) -a statute far clearer than the ACCA residual clause and materially identical to the statute at issue here-so plain as to speak for itself. Thus, in 2004, when the Court first interpreted § 16(b) to require the ordinary-case categorical approach, it relied
 
 only
 
 on the text of the statute, and it did not invoke legislative history or practical concerns.
 
 Leocal
 
 ,
 
 543 U.S. at 7
 
 ,
 
 125 S.Ct. 377
 
 ;
 
 accord
 

 Dimaya
 
 ,
 
 138 S.Ct. at 1204
 
 (plurality opinion) (noting four-Justice plurality, Chief Justice, and Government all "accept[ed] that § 16(b), as long interpreted, demands a categorical approach"). The Government's attempt to rewrite this history is utterly unpersuasive.
 

 B.
 

 Setting aside the origins of the categorical approach, we have reviewed § 924(c)(3)(B) on a clean slate and still find no reasonable construction of its text that supports the Government's conduct-specific approach. The statutory structure, as well as Congress's use of materially identical language to implement an ordinary-case categorical approach in § 16(b), render our conclusion inescapable. Whatever a judge's personal feelings as to what does or does not constitute a crime of violence, we are bound to apply the definition that Congress has prescribed. And Congress could hardly have written a clearer call for the ordinary-case categorical approach than § 924(c)(3)(B).
 

 The text of a statute is a court's first and foremost guide to its meaning.
 

 See, e.g.
 
 ,
 
 Esquivel-Quintana v. Sessions
 
 , --- U.S. ----,
 
 137 S.Ct. 1562
 
 , 1568,
 
 198 L.Ed.2d 22
 
 (2017) (noting that when interpreting a statute, courts "begin, as always, with the text"). Here, the plain text of § 924(c)(3)(B) requires application of the ordinary-case categorical approach. The combination in § 924(c)(3)(B) of the phrase "offense that is a felony" with the qualifier "by its nature" makes Congress's intent apparent.
 

 As the Government itself admits, the definition of "nature" is "the basic or inherent features, character, or quality of something." Oxford Dictionary of English 1183 (3d ed. 2010). Thus, § 924(c)(3)(B) directs courts to consider only the basic or inherent features of "an offense that is a felony."
 
 18 U.S.C. § 924
 
 (c)(3)(B) ;
 
 see also
 

 Dimaya
 
 ,
 
 138 S.Ct. at 1217-18
 
 (plurality opinion) (explaining that phrase "by its nature" directs courts "to figure out what an offense normally ... entails, not what happened to occur on one occasion"). Had Congress intended a conduct-specific analysis instead, "it presumably would have said so; other statutes, in other contexts, speak in just that way."
 
 Descamps v. United States
 
 ,
 
 570 U.S. 254
 
 , 267-68,
 
 133 S.Ct. 2276
 
 ,
 
 186 L.Ed.2d 438
 
 (2013) ;
 
 see, e.g.
 
 ,
 
 18 U.S.C. § 1031
 
 (b)(2) (imposing heightened penalties for fraud offenses that "involve[ ] a conscious or reckless risk of serious personal injury"); 18 U.S.C. § 2332b(a)(1)(B) (punishing certain "conduct" that "creates a substantial risk of serious bodily injury").
 

 Moreover, we cannot adopt a reading of § 924(c)(3)(B) that renders part of the statute superfluous over one that gives effect to its "every clause and word."
 
 United States v. Menasche
 
 ,
 
 348 U.S. 528
 
 , 538-39,
 
 75 S.Ct. 513
 
 ,
 
 99 L.Ed. 615
 
 (1955) (quoting
 
 Inhabitants of Montclair Twp. v. Ramsdell
 
 ,
 
 107 U.S. 147
 
 , 152,
 
 2 S.Ct. 391
 
 ,
 
 27 L.Ed. 431
 
 (1883) ). This well-established rule against surplusage further cuts against the Government's conduct-specific reading, which would empty the phrase "by its nature" of meaning. Indeed, even under the Government's interpretation, giving "by its nature" meaning would shift the § 924(c)(3)(B) inquiry away from conduct-specific facts and back towards a subjective consideration of that conduct's "inherent features"-that is to say, another version of ordinary-case analysis.
 

 The Government does not even attempt to address this problem.
 
 [6]
 
 Instead, it simply quotes a dissent in
 
 Dimaya
 
 to contend that in the context of § 924(c)(3)(B), "the phrase 'by its nature' is reasonably understood to 'mean only that an offender who engages in risky conduct cannot benefit from the fortuitous fact that physical force was not actually used during his offense.' " Gov. Supp. Br. at 14 (quoting
 
 Dimaya
 
 ,
 
 138 S.Ct. at 1254
 
 (Thomas, J., dissenting) ). One of the dissenters here similarly insists that "by its nature" "broad[ens]" the scope of § 924(c)(3)(B), while another argues (seemingly to the contrary) that the phrase actually "limits the residual clause" by excluding conduct that risks force "merely incidentally or by happenstance."
 

 But the
 
 Dimaya
 
 Court did not embrace any of these readings of this text. And for good reason: each would still leave "by its nature" wholly superfluous. If we strike that phrase, § 924(c)(3)(B) 's remaining language would require a finding that an offense "involves a
 
 substantial risk
 
 that physical force ...
 
 may
 
 be used in the course of committing the offense."
 

 18 U.S.C. § 924
 
 (c)(3)(B) (emphasis added). This text read on its own would still encompass both actual uses of physical force and otherwise "risky" conduct in which force was not used. And the requirement that any risk be "substantial" would independently exclude "incidental" uses of force. In other words, under the Government's conduct-specific reinterpretation, § 924(c)(3)(B) would have the same meaning without the phrase "by its nature" as it would with this phrase. This would drain the phrase "by its nature" of any effect, violating a cardinal rule of statutory construction.
 

 The conclusion that "crime of violence" must be defined categorically is made even plainer when we consider the statutory context, as we must.
 
 See
 

 Davis v. Mich. Dep't of Treasury
 
 ,
 
 489 U.S. 803
 
 , 809,
 
 109 S.Ct. 1500
 
 ,
 
 103 L.Ed.2d 891
 
 (1989) ("[W]ords of a statute must be read in their context and with a view to their place in the overall statutory scheme."). The Government concedes that § 924(c)(3)(A), which covers one half of the "crime of violence" definition in § 924(c), mandates a categorical approach. Gov. Supp. Br. at 4. It would stand to reason that § 924(c)(3)(B), the other half of this definition, also requires a categorical approach rather than analysis of "the facts of each defendant's conduct."
 
 Taylor
 
 ,
 
 495 U.S. at 601
 
 ,
 
 110 S.Ct. 2143
 
 .
 

 This conclusion is confirmed by the Supreme Court's refusal to give statutory text variable meanings "depending on the presence or absence of constitutional concerns in each individual case," explaining that such a "novel interpretive approach ... would render every statute a chameleon."
 
 Clark v. Martinez
 
 ,
 
 543 U.S. 371
 
 , 382,
 
 125 S.Ct. 716
 
 ,
 
 160 L.Ed.2d 734
 
 (2005). Under the longstanding interpretation of § 924(c)(3), the statute's single reference to an "offense that is a felony" has a single meaning: it refers to a crime as defined by statute. Accepting the Government's interpretation would require us instead to give this phrase two contradictory meanings, depending on whether the force clause or the residual clause is in play. Specifically, the Government would have us read "offense that is a felony" to refer to an offense as defined by statute in prosecutions under the force clause, but to case-specific conduct in prosecutions under the residual clause. We refuse to so distort the statutory text.
 

 Furthermore, § 924(c)(1)(A), which outlines the elements of a § 924(c) violation, expressly refers to "a crime of violence ... that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device." This phrasing would make no sense under a conduct-specific definition of "crime of violence," as only statutes, not conduct-specific facts, can "provide[ ] for" an amount of punishment.
 
 [7]
 

 Finally, the Government would have us interpret the materially identical 34-word phrase in § 924(c)(3)(B) and § 16(b) in entirely different ways.
 
 [8]
 
 This argument flies in the face of the traditional rule that "a legislative body generally uses a particular word with a consistent meaning in a given context."
 
 Erlenbaugh v. United States
 
 ,
 
 409 U.S. 239
 
 , 243,
 
 93 S.Ct. 477
 
 ,
 
 34 L.Ed.2d 446
 
 (1972). Whatever force this interpretive presumption may have as to one "particular word," it must carry more as applied to the 34-word phrase replicated in § 924(c)(3)(B) and § 16(b).
 
 See supra
 
 n.8. The presumption has more force still because Congress initially added "crime of violence" to § 924(c) and created § 16(b) in the same legislative enactment.
 
 [9]
 

 See
 

 Gustafson v. Alloyd Co., Inc.
 
 ,
 
 513 U.S. 561
 
 , 570,
 
 115 S.Ct. 1061
 
 ,
 
 131 L.Ed.2d 1
 
 (1995) ("[T]he normal rule of statutory construction" is that "identical words used in different parts of the same act are intended to have the same meaning." (internal quotation marks omitted) );
 
 Erlenbaugh
 
 ,
 
 409 U.S. at 244
 
 ,
 
 93 S.Ct. 477
 
 (noting that presumption of consistent meaning "certainly makes the most sense when the statutes were enacted by the same legislative body at the same time"). Thus, it is unsurprising that the Government has been unable to cite even one case in which the Supreme Court or this court have interpreted two materially identical statutes differently, as it urges us to do with § 924(c)(3)(B) and § 16(b).
 

 In sum, our de novo application of ordinary textual analysis yields a mountain of "textual evidence" that § 924(c)(3) 's residual clause-"like ACCA's, except still more plainly"-"has no 'plausible' fact-based reading."
 
 Dimaya
 
 ,
 
 138 S.Ct. at 1218
 
 (plurality opinion) (quoting
 
 Johnson
 
 ,
 
 135 S.Ct. at
 
 2562 );
 
 see also
 

 id.
 
 at 1235 (Roberts, C.J., dissenting) (explaining that the ordinary-case categorical approach outlined in
 
 Leocal
 
 "provides a model for how courts should assess whether a particular crime 'by its nature' involves a risk of the use of physical force" (quoting § 16(b) ) ).
 
 [10]
 

 C.
 

 Resisting this conclusion, the Government contends that the phrases "offense," "felony," "by its nature," "involves," and "committing the offense" in § 924(c)(3)(B)"compel" a conduct-specific approach. Gov. Supp. Br. at 10.
 

 Each of these terms can be susceptible to a conduct-specific analysis in isolation.
 
 See
 

 Nijhawan v. Holder
 
 ,
 
 557 U.S. 29
 
 , 33-34,
 
 129 S.Ct. 2294
 
 ,
 
 174 L.Ed.2d 22
 
 (2009) (construing statute containing the words "offense" and "felony");
 
 Hayes
 
 , 555 U.S. at 420-29,
 
 129 S.Ct. 1079
 
 (construing statute containing the word "offense");
 
 Taylor
 
 ,
 
 495 U.S. at 600-01
 
 ,
 
 110 S.Ct. 2143
 
 (construing statute containing the word "involves");
 
 United States v. Price
 
 ,
 
 777 F.3d 700
 
 , 708-09 (4th Cir. 2015) (construing statute containing the terms "by its nature" and "involves"). But that hardly establishes that these five terms are susceptible to such a reading when appearing together in a single short statute. Rather, each of the cases on which the Government relies involves only
 
 fragments
 
 of the language in § 924(c)(3). Just as importantly, in none of these cases did the court actually rely on these fragments in reaching its holding. In fact, the reasoning that underlies each of the Government's cases buttresses our conclusion that the text of § 924(c)(3)(B) requires an ordinary-case categorical approach.
 

 Consider
 
 Nijhawan
 
 and
 
 Hayes
 
 . In both opinions, the Supreme Court interpreted statutes that paired a reference to "offense" with detailed qualifiers far too specific to refer to generic crimes.
 
 Nijhawan
 
 concerned an immigration statute that included only offenses "involv[ing] fraud or deceit in which the loss to the victim or victims exceed[ed] $10,000."
 
 8 U.S.C. § 1101
 
 (a)(43)(M)(i). In
 
 Hayes
 
 , the qualifier was even more specific: the relevant criminal statute only covered offenses "committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim." 18 U.S.C § 921(a)(33)(A)(ii).
 

 Faced with these precise qualifiers, the Supreme Court concluded that Congress must have intended a conduct-specific approach for these statutes to have any force.
 
 See
 

 Nijhawan
 
 ,
 
 557 U.S. at 37-38
 
 ,
 
 129 S.Ct. 2294
 
 (holding that "to have any meaning at all," qualifier "must refer to the particular circumstances in which an offender committed the crime");
 
 Hayes
 
 , 555 U.S. at 427,
 
 129 S.Ct. 1079
 
 (explaining that categorical reading of qualifier would render statute "a dead letter in some two-thirds of the States from the very moment of its enactment" (internal quotation marks omitted) ). The specificity of each statute-not any talismanic use of "offense" or "involves"-was the crux of both rulings.
 

 The "substantial risk of physical force" proviso in § 924(c)(3)(B) is a far cry from the specific qualifiers in
 
 Nijhawan
 
 and
 
 Hayes
 
 . Rather, the proviso in § 924(c)(3)(B) is materially identical to that in § 16(b), and it is similar to the force requirement in statutes that employ the elements-based categorical approach, like § 924(c)(3)(A) and § 16(a).
 
 Nijhawan
 
 and
 
 Hayes
 
 thus highlight the relative "absence of terms alluding to a crime's circumstances" in § 924(c)(3)(B) beyond those also present in § 16(b).
 
 Dimaya
 
 ,
 
 138 S.Ct. at 1218
 
 (plurality opinion);
 
 see also
 

 id.
 

 at 1217
 
 ("Simple references to a 'conviction,' 'felony,' or 'offense,' we have stated, are 'read naturally' to denote the 'crime as
 
 generally
 
 committed.' " (quoting
 
 Nijhawan
 
 ,
 
 557 U.S. at 34
 
 ,
 
 129 S.Ct. 2294
 
 ) ). The differences between these
 statutes and § 924(c)(3)(B) reinforce rather than defeat a categorical reading here.
 

 Moreover, despite seeking to rely on
 
 Nijhawan
 
 , the Government overlooks one of
 
 Nijhawan
 
 's key teachings. For there, the Court expressly recognized that where Congress "uses similar statutory language and similar statutory structure in two adjoining provisions, it normally intends similar interpretations."
 
 Nijhawan
 
 ,
 
 557 U.S. at 39
 
 ,
 
 129 S.Ct. 2294
 
 . Here, Congress did not just use "similar" language in the "two adjoining provisions" of § 924(c)(3)(A) and § 924(c)(3)(B) : it tied both definitions to the same use of the introductory phrase "offense that is a felony." As we have already explained, the Government's reading would give that phrase a conduct-specific interpretation under one provision and a categorical interpretation under the adjoining provision.
 

 As to
 
 Taylor
 
 , the Government's reliance is inexplicable. It cites that case alone for the proposition that "the Supreme Court has previously relied on the
 
 absence
 
 of the word 'involves' as indicating that a categorical approach
 
 is
 
 required." Gov. Supp. Br. at 13 (citing
 
 Taylor
 
 ,
 
 495 U.S. at 600
 
 ,
 
 110 S.Ct. 2143
 
 ). But
 
 Taylor
 
 did not rely on the absence of the word "involves" to require use of the categorical approach. The
 
 Taylor
 
 Court simply recognized that the ACCA force clause defined a "violent felony" as one that " 'has as an element'-not any crime that, in a particular case, involves-the use or threat of force."
 
 495 U.S. at 600
 
 ,
 
 110 S.Ct. 2143
 
 (quoting § 924(e)(2)(B)(i) ). The Government's contrary argument is especially unconvincing given that the Supreme Court has held that the ACCA residual clause and § 16(b), both of which use the word "involves," mandate the ordinary-case categorical approach.
 
 E.g.
 
 ,
 
 Johnson
 
 ,
 
 135 S.Ct. at
 
 2561-62 ;
 
 Leocal
 
 , 543 U.S. at 7,
 
 125 S.Ct. 377
 
 .
 

 The Government's reliance on
 
 Taylor
 
 , like its reliance on
 
 Nijhawan
 
 , also ignores a critical element of the Supreme Court's analysis. The
 
 Taylor
 
 Court reasoned that the term "burglary" as used in ACCA "most likely refer[red] to the elements of the statute of conviction, not to the facts of each defendant's conduct," in part because of its proximity to the ACCA force clause.
 
 495 U.S. at 600-01
 
 ,
 
 110 S.Ct. 2143
 
 . In this case, the proximity of § 924(c)(3)(B) to the force clause in § 924(c)(3)(A) warrants a similar inference. Thus,
 
 Taylor
 
 offers no more support to the Government's novel argument than
 
 Nijhawan
 
 or
 
 Hayes
 
 .
 

 Finally, the Government emphasizes that we have applied a conduct-specific analysis to a provision of the Sex Offender Registration and Notification Act ("SORNA") that uses the phrase "by its nature."
 
 Price
 
 ,
 
 777 F.3d at 708-09
 
 . But in fact, each step of our textual analysis in that case supports a contrary result here.
 

 In
 
 Price
 
 , we followed
 
 Nijhawan
 
 and
 
 Hayes
 
 to hold that "where a statute contains language that ... refers to specific circumstances or conduct," "Congress meant to allow the circumstance-specific approach's more searching factual inquiry."
 

 Id.
 

 at 708
 
 (alteration in original) (internal quotation marks omitted). Here, Congress's omission of this conduct-specific language in § 924(c)(3)(B) warrants the opposite inference. In
 
 Price
 
 , we noted that because Congress referenced "elements" in one subsection of SORNA, its contrasting terminology of "a criminal offense" in the next required a broader reading under the canon of meaningful variation.
 

 Id.
 

 at 708-09
 
 . Here, the ordinary-case categorical approach of § 924(c)(3)(B) is
 
 already
 
 broader than the elements-based approach of § 924(c)(3)(A), and both clauses refer to the same usage of the phrase "offense that
 is a felony." The canon of meaningful variation thus offers the Government no support. And in
 
 Price
 
 , we recognized that because SORNA made "explicit reference to the 'conduct' underlying a prior offense, as well as the 'nature' of that conduct," it "refer[red] to how an offense was committed-not a generic offense."
 

 Id.
 

 at 709
 
 (quoting
 
 Nijhawan
 
 ,
 
 557 U.S. at 37-39
 
 ,
 
 129 S.Ct. 2294
 
 ). Here, Congress wrote § 924(c)(3)(B) (unlike SORNA) to refer not to "conduct ... by its nature" but "an offense that is a felony ... by its nature."
 
 18 U.S.C. § 924
 
 (c)(3)(B).
 
 Price
 
 supports adherence to the ordinary-case categorical approach, rather than adoption of the Government's new construction.
 

 To summarize, the text, structure, and context of § 924(c)(3)(B) clearly mandate use of the ordinary-case categorical approach, as do all relevant precedents. Given the Government's concession that use of this mode of analysis renders the statute unconstitutionally vague, this dooms the Government's defense of the statute.
 

 V.
 

 As the Supreme Court has repeatedly instructed, when statutory language is clear, "judicial inquiry is complete."
 
 Conn. Nat'l Bank v. Germain
 
 ,
 
 503 U.S. 249
 
 , 254,
 
 112 S.Ct. 1146
 
 ,
 
 117 L.Ed.2d 391
 
 (1992) (internal quotation marks omitted). Refusing to abide by this instruction, the Government heavily relies on considerations unrelated to the unambiguous text to support its new conduct-specific interpretation of § 924(c)(3)(B). We doubt such external considerations are relevant. But to the extent that they are, they confirm our decision to adhere to the ordinary-case categorical approach rather than adopting the Government's new conduct-specific reinterpretation.
 

 A.
 

 We begin with practical considerations. The Government contends that notwithstanding the statutory text, we should apply a conduct-specific approach to § 924(c)(3)(B) because it, unlike the ACCA residual clause or some applications of § 16(b), always involves charges prosecuted contemporaneously with any underlying crimes of violence. According to the Government, this means "the categorical approach serves no purpose" in the context of § 924(c)(3)(B). Gov. Supp. Br. at 20. Even setting aside the plain text of the statute, the argument fails for two fundamental reasons.
 

 First, § 924(c)(3)(B) 's failure to require a court to assess past conduct hardly compels rejection of the categorical approach. Rather, the categorical approach applies to a number of statutes that require no assessment of past conduct. Most notably, the Government itself concedes that Congress has "require[d] a categorical approach" in defining a "crime of violence" under the force clause, § 924(c)(3)(A), the only other subsection of § 924(c)(3). Gov. Supp. Br. at 4. And the force clause, like the neighboring residual clause challenged here, applies
 
 only
 
 to contemporaneous offenses, not prior convictions.
 

 Congress, through § 16, has also applied the categorical approach to many other statutes that similarly involve contemporaneous prosecutions.
 
 See, e.g.
 
 ,
 
 18 U.S.C. § 1952
 
 (a)(2) (criminalizing travel or use of mail with intent to commit any "crime of violence");
 
 18 U.S.C. § 842
 
 (p)(2)(A) (prohibiting teaching, demonstration, or dissemination of information intended for use in committing a "crime of violence"); 18 U.S.C. § 3663A(c)(1)(A)(i) (mandating restitution to victims of certain "crime[s] of violence," citing § 16 );
 
 18 U.S.C. § 5032
 
 (permitting federal trials of juveniles in certain cases where "the offense charged is
 a crime of violence that is a felony").
 
 [11]
 

 The second reason the Government's practical argument fails is that, contrary to its suggestion otherwise, use of the categorical approach in § 924(c) does serve important purposes. Congress acted with good reasons in mandating a categorical approach here, even if the real-world benefits differ from those that arise in the context of prior convictions. Specifically, § 924(c) 's categorical "crime of violence" analysis serves the purpose of limiting the statute's penalties to specific classes of federal crimes where the use of a firearm is especially dangerous.
 
 See
 

 Rosemond
 
 ,
 
 572 U.S. at 75
 
 ,
 
 134 S.Ct. 1240
 
 (" § 924(c)... punishes the temporal and relational conjunction of two separate acts, on the ground that together they pose an extreme risk of harm.");
 
 cf.
 

 Solem v. Helm
 
 ,
 
 463 U.S. 277
 
 , 292,
 
 103 S.Ct. 3001
 
 ,
 
 77 L.Ed.2d 637
 
 (1983) (stating relevance of "gravity of the offense" to proportionality of sentence).
 

 Congress amended § 924(c) over time to accomplish this very purpose. Before 1984, § 924(c) criminalized the use or unlawful carrying of a firearm in conjunction with "any [federal] felony."
 
 18 U.S.C. § 924
 
 (c) (1982). In 1984, Congress narrowed the statute to "crime[s] of violence," defined in relevant part as they are today. Comprehensive Crime Control Act, § 1005(a), 98 Stat. at 2138-39. Two years later, Congress limited these "crimes of violence" to felonies while adding "drug trafficking crimes" to the statute's scope. Firearm Owners' Protection Act, § 104, 100 Stat. at 456-59. Thus, Congress has amended § 924(c) to make it crystal clear that not every federal felony involving use of a gun constitutes a "crime of violence." Rather, the modern statute requires the prosecution to make two distinct showings: first, that the defendant utilized a firearm, and second, that the defendant did so in conjunction with not just any felony, but specifically a crime of violence or drug trafficking crime.
 
 Smith
 
 ,
 
 508 U.S. at 227-28
 
 ,
 
 113 S.Ct. 2050
 
 .
 

 The Government's interpretation of § 924(c)(3)(B) would eliminate Congress's intentional choice to narrow the application of § 924(c) from "any felon[ies]" to
 
 only
 
 "crime[s] of violence" and "drug trafficking crime[s]." As the Government acknowledges, its reading of the statute would require juries to consider at trial whether an offender's specific conduct involved a substantial risk of physical force. But the use, carrying, or possession of a firearm, standing alone, will always suffice to generate such a risk in a conduct-specific analysis, regardless of the nature of the underlying offense. If we were to adopt a conduct-specific approach, we would in effect judicially repeal the 1984 and 1986 congressional amendments to § 924(c).
 

 Attempting to address this problem, the Government claims that jurors could avoid collapsing the firearm and crime of violence elements if they were instructed not to find a crime of violence based
 
 solely
 
 on
 the presence of a firearm.
 
 See
 

 Ovalles
 
 , 905 F.3d at 1250 n.8 (adopting Government's proposed instruction). But this solution offers no affirmative principle to guide jury decision-making. How, exactly, are jurors to keep these two showings apart? Should they cross out facts involving the firearm? Imagine the firearm wasn't there? Pretend it was inoperable? Instead of condemning jurors to such an ill-defined inquiry, categorical analysis limits § 924(c) 's additional sanctions to the discrete and particularly serious classes of felonies selected by Congress-drug trafficking crimes and crimes of violence.
 
 [12]
 

 In sum, even if practical considerations could influence our construction of the clear text of § 924(c)(3)(B), they do not offer the Government any refuge.
 

 B.
 

 Having opened the door to external considerations, it is noteworthy that the Government does not ask us to examine the legislative history of § 924(c). Perhaps that is because the legislative history suggests that Congress intended a categorical approach. Recall that before 1984, § 924(c) penalized the use of a firearm in conjunction with any federal felony. A 1979 Senate bill unsuccessfully proposed amending § 924(c) to narrow its application to crimes of violence, largely as defined today. Criminal Code Reform Act of 1979, S. 1722, 96th Cong. § 1823 (1979). The Senate Judiciary Committee stated it was "doubtful" that "felonies involving the possession of narcotics with intent to distribute ... would be considered by their nature to involve a substantial risk of the use of physical force against another." S. Rep. No. 96-553, at 849 n.43 (1980). If § 924(c)(3)(B) required a conduct-specific analysis, this statement would make no sense, because using a firearm during and in relation to a narcotics felony would almost certainly generate a substantial risk of force.
 

 Congress did not enact this specific bill. But it did subsequently limit § 924(c) to crimes of violence in 1984, and it defined the term "crime of violence" in § 16 at the same time. Comprehensive Crime Control Act, §§ 1001, 1005(a), 98 Stat. at 2136, 2138-39. The Senate Judiciary Committee explained that it intended the revised statute to include "all persons who commit Federal crimes of violence, including those crimes
 
 set forth in statutes
 
 which already provide for enhanced sentences for their commission with a dangerous weapon." S. Rep. No. 98-225, at 313 (1983) (emphasis added). The Committee additionally noted that the "crime of violence" limitation "expand[ed] the scope of
 
 predicate offenses
 
 ... by including some violent misdemeanors, but restrict[ed] it by excluding non-violent felonies."
 
 Id.
 
 at 313 n.9 (emphasis added). Though not dispositive, the Committee's language again supports a categorical interpretation.
 

 But, like practical considerations, quotes from committee reports cannot and do not control our reading of § 924(c)(3)(B). We note, however, that the Government has produced nothing from the legislative record to support its conduct-specific interpretation. And if Congress truly intended the materially identical text in § 16(b) and § 924(c)(3)(B) to embody such divergent
 approaches, we would expect to find some explanation of that divergence. Instead, the legislative history of § 924(c)(3)(B) offers the Government no assistance.
 

 C.
 

 The bedrock doctrine of stare decisis further weakens the Government's position. Adherence to precedent is the preferred course for courts "because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process."
 
 Payne v. Tennessee
 
 ,
 
 501 U.S. 808
 
 , 827,
 
 111 S.Ct. 2597
 
 ,
 
 115 L.Ed.2d 720
 
 (1991).
 

 Of course, stare decisis "is not an inexorable command."
 

 Id.
 

 at 828
 
 ,
 
 111 S.Ct. 2597
 
 . But precedent exerts a particularly "powerful" pull in the context of "settled statutory meaning" because "Congress remains free to alter what [the courts] have done."
 
 Shepard
 
 ,
 
 544 U.S. at 23
 
 ,
 
 125 S.Ct. 1254
 
 (internal quotation marks omitted).
 

 Here, the considered circuit consensus, pre-
 
 Dimaya
 
 , that § 924(c)(3)(B) requires an ordinary-case categorical approach strongly favors adherence to such an interpretation.
 
 [13]
 
 "In this case, time has enhanced even the usual precedential force,"
 
 Shepard
 
 ,
 
 544 U.S. at 23
 
 ,
 
 125 S.Ct. 1254
 
 , because the federal courts of appeals have interpreted § 924(c)(3)(B) to preclude conduct-specific analysis for decades. And although Congress amended § 924(c) repeatedly as this consensus built, it never materially changed the definition of "crime of violence" after 1986.
 
 See, e.g.
 
 , Pub. L. No. 105-386, § 1,
 
 112 Stat. 3469
 
 , 3469 (1998) (adding "possess[ing] a firearm" "in furtherance of" specified crimes to § 924(c) ); Pub. L. No. 109-92, § 6,
 
 119 Stat. 2095
 
 , 2102 (2005) (creating § 924(c)(5) to impose additional penalties for armor-piercing ammunition).
 

 Circuit case law (even if unanimous, as here) carries less weight than Supreme
 Court jurisprudence, and we are hesitant to over-analyze congressional inaction. But we would be remiss to discount the fact that between at least 1994 and April 2018,
 
 every § 924(c) conviction
 
 of which we are aware relied on precedents treating crime of violence determinations under § 924(c)(3)(B) (not to mention those under § 16(b) )
 
 [14]
 
 as questions of law requiring categorical analysis. Stability, consistency, and coherence therefore counsel against the Government's rejection of this approach.
 

 D.
 

 Finally, a trio of remaining considerations further confirm our adherence to the ordinary-case categorical approach or otherwise offer no support to the Government.
 

 Although we have chosen not to treat the Government's withdrawal of its conduct-specific interpretation as abandonment, it remains notable that the United States embraced an ordinary-case categorical reading of this language for years, and even disclaimed a conduct-specific reading after
 
 Johnson
 
 . In
 
 Dimaya
 
 , for example, the Government "accept[ed]" that materially identical text in § 16(b), as incorporated into the Immigration and Nationality Act, "demand[ed] a categorical approach."
 
 Dimaya
 
 ,
 
 138 S.Ct. at 1216
 
 . It did so even though a conduct-specific inquiry in that case, which involved a deportation determination, raised none of the Sixth Amendment concerns implicated in the context of criminal sentencing. The Government was right to take this position: a majority of Justices in both
 
 Johnson
 
 and
 
 Dimaya
 
 accepted this reading and declined to reinterpret the ACCA residual clause and § 16(b) to employ a conduct-specific approach.
 
 Dimaya
 
 ,
 
 138 S.Ct. at 1216-18
 
 (plurality opinion);
 

 id.
 

 at 1235
 
 (Roberts, C.J., dissenting) (citing
 
 Leocal
 
 , 543 U.S. at 10-11,
 
 125 S.Ct. 377
 
 );
 
 Johnson
 
 ,
 
 135 S.Ct. at 2561-62
 
 . Regardless of the Government's rationale, its most recent change of position can only be read as a late-breaking effort to resuscitate a twice-rejected argument.
 

 Moreover, if the Government were correct and the text at issue here were truly so ambiguous as to lend itself to two very different forms of analysis-an ordinary-case categorical approach in § 16(b) and a conduct-specific approach in § 924(c)(3)(B) -the rule of lenity might nonetheless yield the same result that we reach now. For in the case at hand, this doctrine would tilt in favor of Simms.
 
 See
 

 Hayes
 
 , 555 U.S. at 436,
 
 129 S.Ct. 1079
 
 (Roberts, C.J., dissenting) (describing statute that was ambiguous about categorical approach as "textbook case for application of the rule of lenity").
 

 Further, we are not persuaded by the Government's contention that "the strong societal interest in finality," particularly as it pertains to guilty pleas, favors saving § 924(c)(3)(B) rather than striking it down.
 
 Lee v. United States
 
 , --- U.S. ----,
 
 137 S.Ct. 1958
 
 , 1967,
 
 198 L.Ed.2d 476
 
 (2017). Under the unusual circumstances presented here, finality cuts both ways. The parties agree that the longstanding interpretation of § 924(c)(3)(B) is unconstitutional. Accordingly, past convictions employing the ordinary-case categorical approach will
 be called into question regardless of whether we invalidate the statute or adopt a new conduct-specific reading that all rejected before
 
 Dimaya
 
 . If concerns about opening the floodgates are relevant to our interpretation of § 924(c)(3)(B) -and we doubt that they are-they do not favor either reading.
 

 VI.
 

 Perhaps recognizing that its textual analysis of § 924(c)(3)(B) is untenable and its reliance on external considerations unconvincing, the Government urges us to embrace its new reading of the statute as a matter of constitutional avoidance. We will not "lightly ascribe ... an unconstitutional intent" to Congress.
 
 Ward v. Dixie Nat'l Life Ins. Co.
 
 ,
 
 595 F.3d 164
 
 , 177 (4th Cir. 2010). But given the clear language of § 924(c)(3)(B), we lack the power to avoid its constitutional infirmity.
 

 We are "obligated to construe [a] statute to avoid [constitutional] problems."
 
 INS v. St. Cyr
 
 ,
 
 533 U.S. 289
 
 , 300,
 
 121 S.Ct. 2271
 
 ,
 
 150 L.Ed.2d 347
 
 (2001). However, we may do this only if such a reading is "fairly possible,"
 

 id.
 

 (internal quotation marks omitted), "after the application of ordinary textual analysis,"
 
 Jennings v. Rodriguez
 
 , --- U.S. ----,
 
 138 S.Ct. 830
 
 , 842,
 
 200 L.Ed.2d 122
 
 (2018) (internal quotation marks omitted). Where, as here, there is an "absence of more than one plausible construction," the canon of constitutional avoidance "simply has no application."
 
 Jennings
 
 , 138 S.Ct. at 842 (internal quotation marks omitted).
 

 This limitation is an important one. As the Supreme Court recently explained, "[s]potting a constitutional issue does not give a court the authority to rewrite a statute as it pleases."
 
 Id.
 
 at 843. Rather, constitutional avoidance serves the "basic democratic function of maintaining a set of statutes that reflect, rather than distort, the policy choices that elected representatives have made."
 
 Almendarez-Torres v. United States
 
 ,
 
 523 U.S. 224
 
 , 238,
 
 118 S.Ct. 1219
 
 ,
 
 140 L.Ed.2d 350
 
 (1998). The doctrine is thus "a means of giving effect to congressional intent, not of subverting it."
 
 Clark
 
 , 543 U.S. at 382,
 
 125 S.Ct. 716
 
 . In the words of the Chief Justice, "rewrit[ing] a law to conform it to constitutional requirements ... would constitute a serious invasion of the legislative domain."
 
 United States v. Stevens
 
 ,
 
 559 U.S. 460
 
 , 481,
 
 130 S.Ct. 1577
 
 ,
 
 176 L.Ed.2d 435
 
 (2010) (alterations and internal quotation marks omitted).
 

 In this regard, the seemingly disparate doctrines of vagueness and constitutional avoidance unite. Both demand respect for the distinct functions that Congress and the judiciary fulfill in our constitutional republic. Due process requires Congress to speak in definite terms, particularly where the consequences for individual liberties are steep, in part because Congress alone-not the executive or the judiciary-is equipped to balance competing policy priorities and to define the boundaries of criminal law. For similar reasons, although courts must interpret statutes under the presumption that legislators do not intend to violate the Constitution, judges cannot revise invalid statutes. To the contrary, while the grave remedy of striking down a statute as unconstitutional lies within the judicial province, rewriting it is a task solely for the elected legislature.
 

 These principles compel us to reject the Government's constitutional avoidance argument. Given the text and context of § 924(c)(3)(B), accepting the Government's new interpretation would amount to judicially rewriting the statute.
 

 The United States does not merely seek to narrow an ambiguous statute, as the Supreme Court did in
 
 Skilling v. United States
 
 ,
 
 561 U.S. 358
 
 , 404,
 
 130 S.Ct. 2896
 
 ,
 
 177 L.Ed.2d 619
 
 (2010), and
 
 Zadvydas v. Davis
 
 ,
 
 533 U.S. 678
 
 , 682,
 
 121 S.Ct. 2491
 
 ,
 
 150 L.Ed.2d 653
 
 (2001) -the latter being "a notably generous application of the constitutional-avoidance canon."
 
 Jennings
 
 , 138 S.Ct. at 843. Here, the Government asks us to go "much further,"
 
 id.
 
 , by adopting a conduct-specific reading of § 924(c)(3)(B) that directly conflicts with how courts and the United States itself have thoughtfully interpreted this statute (and materially identical text in § 16(b) ) since its enactment three decades ago. Tellingly, the Government has yet to identify any case in which the Supreme Court has done anything comparable in the name of constitutional avoidance.
 
 [15]
 

 We cannot usurp the legislative role to edit out the constitutional flaw in § 924(c)(3)(B). The plain text, structure, and context of § 924(c)(3) are more than enough to convince us that its residual clause has no plausible conduct-specific interpretation. We therefore refuse to rewrite the statute, just as the Supreme Court refused to rewrite § 16(b) and the ACCA residual clause, even in the face of vigorous dissents urging the employment of constitutional avoidance.
 
 See
 

 Dimaya
 
 , 138 S.Ct. at 1216-18 (plurality opinion);
 
 id.
 
 at 1232-33 (Gorsuch, J., concurring in part and concurring in the judgment);
 
 Johnson
 
 ,
 
 135 S.Ct. at 2561-62
 
 .
 

 VII.
 

 We are mindful of the consequences of holding § 924(c)(3)(B) unconstitutional. The provision is part of a widely used criminal statute enacted by Congress, and like § 16(b), it has been incorporated into other parts of the federal criminal code.
 
 See
 

 18 U.S.C. §§ 844
 
 (o), 1028(b)(3)(B). We do, however, note that our ruling is limited in important respects.
 

 First, § 924(c)(3)(B) appears to be the last federal statute that directs courts to impose penalties based on a drifting ordinary-case categorical inquiry and an indeterminate risk threshold. The Government has not pointed to any other statute that our decision places in jeopardy, and there is no colorable argument that the elements-based categorical approach of § 924(c)(3)(A) suffers from any similar indeterminacy. Section 924(c)(3)(B) is, in other words, the last
 
 Johnson
 
 domino to fall. In striking it down, we leave intact the balance of the definition of "crime of violence" and the entirety of the definition of "drug trafficking crime" in § 924(c).
 

 Second, nothing in our holding restricts the broad discretion of district judges to make case-by-case sentencing determinations. Here, for example, the district court was authorized to sentence Simms to as much as 240 months' incarceration on his conviction for Hobbs Act conspiracy alone - that is, more than three years longer than the total sentence it actually imposed on both counts. Although judges must consult the advisory Sentencing Guidelines, they may vary from these recommendations in light of the factors listed
 in
 
 18 U.S.C. § 3553
 
 (a).
 
 See, e.g.
 
 ,
 
 Peugh v. United States
 
 ,
 
 569 U.S. 530
 
 , 536,
 
 133 S.Ct. 2072
 
 ,
 
 186 L.Ed.2d 84
 
 (2013). Foremost among these is "the nature and circumstances of the offense," which will necessarily include whether the offender used a firearm.
 
 18 U.S.C. § 3553
 
 (a)(1).
 

 Last, Congress is fully equipped to revise the statute here. As Justice Gorsuch noted in
 
 Dimaya
 
 :
 

 Vagueness doctrine represents a procedural, not a substantive, demand. It does not forbid the legislature from acting toward any end it wishes, but only requires it to act with enough clarity that reasonable people can know what it is required of them and judges can apply the law consistent with their limited office.
 

 Dimaya
 
 , 138 S.Ct. at 1233 (Gorsuch, J., concurring in part and concurring in the judgment). These insights apply here. If Congress deems it appropriate to replace § 924(c)(3)(B) with a statute that achieves similar aims with sufficiently definite terms, the Due Process Clause poses no obstacle.
 

 VIII.
 

 For the foregoing reasons, the judgment of the district court is
 

 REVERSED AND REMANDED
 
 .
 

 WYNN, Circuit Judge, with whom HARRIS, Circuit Judge, joins, concurring:
 

 In this case we must decide whether to jettison the "categorical" approach for determining whether an offense is a "crime of violence" for the purpose of
 
 18 U.S.C. § 924
 
 (c)(3)(B) -an approach that the executive and judicial branches uniformly have embraced for several decades, and which the government advanced to this court as recently as October 2016
 
 [1]
 
 -and replace it with a "case-specific" approach. The dissenting opinions argue that, in refusing to abandon the categorical approach, the majority opinion-with which I concur in full-is at odds with the doctrine of constitutional avoidance.
 
 E.g.
 
 ,
 
 Post
 
 at 272-73 (Richardson, J.). In particular, my dissenting colleagues maintain that constitutional avoidance compels adoption of the case-specific approach in order to "reflect, rather than distort, the policy choices that the elected representatives have made."
 
 Post
 
 at 272 (Niemeyer, J.) (quoting
 
 Almendarez-Torres v. United States
 
 ,
 
 523 U.S. 224
 
 , 238,
 
 118 S.Ct. 1219
 
 ,
 
 140 L.Ed.2d 350
 
 (1998) ).
 

 Yet it is my dissenting colleagues' misguided application of the doctrine of constitutional avoidance-not the majority opinion's adherence to the long-standing understanding of Section 924(c)(3)(B) -that has the potential to "distort" the Framers' carefully crafted allocation of powers for defining crimes and punishments. Relying on constitutional avoidance as a basis for replacing the categorical approach with a case-specific approach, as my dissenting colleagues suggest, would
 
 broaden
 
 the universe of defendants subject to Section 924(c)(3)(B). But, to date, the Supreme Court has applied the doctrine only to
 
 narrow
 
 a criminal statute's breadth and thereby forestall constitutional concerns. By relying on constitutional avoidance
 to
 
 expand
 
 a criminal statute's reach, my dissenting colleagues embrace an unprecedented application of the doctrine of constitutional avoidance that empowers the judiciary to usurp Congress's exclusive authority to establish crimes and punishments. I write separately to explain why I do not believe the Constitution permits judicial encroachment into such a well-defined legislative province.
 

 I.
 

 Section 924(c)(1)(A) provides that a person who "uses or carries a firearm" "during and in relation to any crime of violence" or who "possesses a firearm" "in furtherance of any such crime" may be convicted of both the underlying crime and the additional crime of using a firearm in connection with a "crime of violence." Section 924(c)(3)(B) defines "crime of violence" as a felony offense "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." Accordingly, to convict a defendant of violating Section 924(c), a jury must find both that the defendant possessed or used a firearm and that the defendant did so in connection with a "crime of violence."
 

 As the majority explains, prior to the Supreme Court's decision in
 
 Sessions v. Dimaya
 
 , --- U.S. ----,
 
 138 S.Ct. 1204
 
 ,
 
 200 L.Ed.2d 549
 
 (2018), federal courts-at the government's urging and in accordance with the Supreme Court's construction of virtually identical language in other statutes,
 
 see, e.g.
 
 ,
 
 Taylor v. United States
 
 ,
 
 495 U.S. 575
 
 , 601,
 
 110 S.Ct. 2143
 
 ,
 
 109 L.Ed.2d 607
 
 (1990) -universally held that courts must apply the ordinary-case categorical approach in determining whether a predicate offense constitutes a crime of violence for purposes of Section 924(c)(3)(B). Under the ordinary-case categorical approach, a court must determine whether the hypothetical "ordinary case" of an offense-
 
 i.e.
 
 , not under the particular facts giving rise to the defendant's prosecution,
 
 Dimaya
 
 , 138 S.Ct. at 1211 -"involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." By contrast, under the case-specific, or "circumstance-specific," approach now advanced by the government, and embraced by my colleagues in dissent, a jury would decide whether the specific
 
 conduct
 
 giving rise to the defendant's prosecution involves a "substantial risk that physical force against the person or property of another may be used."
 
 See
 

 United States v. Price
 
 ,
 
 777 F.3d 700
 
 , 704 (4th Cir. 2015).
 

 If this Court were to replace the ordinary-case categorical approach with the case-specific approach, then offenses that courts have found do not constitute crimes of violence under the ordinary-case categorical approach will amount to crimes of violence under the case-specific approach. The Ninth Circuit has held, for example, that involuntary manslaughter,
 
 18 U.S.C. § 1112
 
 , is not categorically a crime of violence because it "requires a mental state of only gross negligence."
 
 United States v. Benally
 
 ,
 
 843 F.3d 350
 
 , 354 (9th Cir. 2016). Yet it takes little effort to imagine specific cases of involuntary manslaughter-particularly cases involving guns, which must be present to implicate Section 924(c)(3)(B) -that a jury would find constitute a "crime of violence" under the case-specific approach. In
 
 Benally
 
 , for example, the defendant shot and killed the victim with a rifle.
 

 Id.
 

 at 352
 
 . At trial, the government presented that the "shooting was accidental and part of a drunken game."
 
 Id
 
 . at 352. Accordingly, the
 
 Benally
 
 defendant, who was not amenable to prosecution under Section 924(c)(3)(B) under the ordinary-case categorical approach, would face a
 high probability of conviction under the case-specific approach because a jury would likely find that the defendant's conduct posed "a substantial risk that physical force against the person ... of another may be used," notwithstanding that the crime requires "a mental state of only gross negligence."
 
 Id
 
 . at 354.
 

 Benally
 
 demonstrates that if this Court abandons use of the ordinary-case categorical approach to determine whether an offense constitutes a "crime of violence" for purposes of Section 924(c)(3)(B) and adopts the case-specific approach the government belatedly advances-and our dissenting colleagues embrace-then the universe of defendants subject to prosecution under Section 924(c)(3)(B) will be substantially greater. Put differently, the adoption of the case-specific approach would expand the reach of Section 924(c)(3)(B) to a new class of offenders-namely those offenders who commit offenses that do not "ordinar[ily]" pose a "substantial risk" of application of physical force against another, but which pose such a risk under the specific factual circumstances of the offender's case (perhaps because the offender was carrying a gun when he committed the offense).
 
 [2]
 

 II.
 

 Because a shift to the case-specific approach will broaden the class of offenders subject to prosecution under Section 924(c)(3)(B), I believe constitutional avoidance is an improper basis for a court to choose the case-specific approach over the ordinary-case categorical approach. As the majority opinion correctly explains, the canon of constitutional avoidance is a "tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts."
 
 Clark v. Martinez
 
 ,
 
 543 U.S. 371
 
 , 381,
 
 125 S.Ct. 716
 
 ,
 
 160 L.Ed.2d 734
 
 (2005) ;
 
 ante
 
 at 238.
 

 In the context of constitutional challenges to criminal statutes, the Supreme Court and lower courts have applied the
 doctrine of constitutional avoidance to adopt a "
 
 narrow[ing]
 
 constru[ction]" that avoids constitutional concerns that would arise were the statute construed more broadly.
 
 Skilling v. United States
 
 ,
 
 561 U.S. 358
 
 , 407 n.40, 409 n.43,
 
 130 S.Ct. 2896
 
 ,
 
 177 L.Ed.2d 619
 
 (2010) (emphasis added) (quoting
 
 United States v. Lanier
 
 ,
 
 520 U.S. 259
 
 , 267-68 n.6,
 
 117 S.Ct. 1219
 
 ,
 
 137 L.Ed.2d 432
 
 (1997) ). For example, in
 
 Skilling
 
 , the Supreme Court considered a vagueness challenge to the honest-services wire fraud statute.
 

 Id.
 

 at 402-03
 
 ,
 
 130 S.Ct. 2896
 
 . Recognizing that the defendant's "vagueness challenge ha[d] force," the Court applied the doctrine of constitutional avoidance to "par[e] down" the statute to "
 
 only
 
 [its] bribe-and-kickback core."
 

 Id.
 

 at 409 & n.43,
 
 130 S.Ct. 2896
 
 . In reaching this conclusion, the Supreme Court emphasized that, in view of the statute's legislative history, as well as consistent judicial interpretation, there was "no doubt that Congress intended § 1346 to reach
 
 at least
 
 bribes and kickbacks."
 
 Id
 
 . at 405, 408-09,
 
 130 S.Ct. 2896
 
 (emphasis in original). Put differently, the Supreme Court applied the doctrine of constitutional avoidance to narrow the statute's scope to a range of conduct that Congress
 
 unambiguously intended
 
 to render unlawful.
 

 Skilling
 
 recognized that "cases '
 
 paring down
 
 ' federal statutes to avoid constitutional shoals are legion."
 

 Id.
 

 at 406 n.40, 409 n.43,
 
 130 S.Ct. 2896
 
 (emphasis added) (collecting cases). By contrast, the government has not identified a single case-nor have I-in which the Supreme Court has applied the doctrine of constitutional avoidance to
 
 expand
 
 the reach of a criminal statute, as my colleagues in dissent suggest we do in construing Section 924(c)(3)(B).
 

 That no court appears to have applied constitutional avoidance to construe a statute to "proscribe a
 
 wider
 
 range of offensive conduct,"
 
 id.
 
 at 408,
 
 130 S.Ct. 2896
 
 (emphasis added), is unsurprising. The Constitution vests the "power of punishment ... in the legislative, not in the judicial department."
 
 Dowling v. United States
 
 ,
 
 473 U.S. 207
 
 , 214,
 
 105 S.Ct. 3127
 
 ,
 
 87 L.Ed.2d 152
 
 (1985) (quoting
 
 United States v. Wiltberger
 
 ,
 
 5 Wheat. 76
 
 , 95,
 
 5 L.Ed. 37
 
 (1820) ). Indeed, it "is the legislature, not the Court, which is to define a crime, and ordain its punishment."
 
 Id
 
 .
 

 The Supreme Court has held that applying the doctrine of constitutional avoidance to "par[e] down" the scope of a constitutionally suspect criminal statute does not amount to usurpation of Congress's singular authority to define crimes and punishments.
 
 See
 

 Skilling
 
 ,
 
 561 U.S. at
 
 409 n.43,
 
 130 S.Ct. 2896
 
 (explaining that the Court does not usurp Congress's authority to define crimes and punishment when it "par[es] down federal statutes to avoid constitutional shoals" because, in such circumstances, "the Court does not
 
 legislate
 
 , but instead
 
 respects the legislature
 
 , by preserving a statute through a limiting interpretation").
 
 But see
 

 id.
 
 at 422,
 
 130 S.Ct. 2896
 
 (Scalia, J., dissenting) ("I know of no precedent for such 'paring down,' and it seems to me clearly beyond judicial power."). But the Supreme Court has sanctioned the use of constitutional avoidance to narrow a potentially unconstitutional criminal statute's scope
 
 only
 
 when there is "
 
 no doubt
 
 that Congress intended [the statute] to reach" the conduct proscribed by the limiting construction.
 
 Id.
 
 at 408,
 
 130 S.Ct. 2896
 
 (majority op.) (emphasis added). In
 
 Skilling
 
 , for example, the Court's limiting construction preserved the honest-services fraud statute's "solid core."
 

 Id.
 

 Put differently, a court may apply constitutional avoidance to narrow the scope of a constitutionally suspect statute without infringing on Congress's exclusive authority to define crimes and punishments because the conduct proscribed by the limiting construction
 necessarily falls within the scope of the conduct Congress intended to proscribe.
 

 The same cannot be said when a court applies the doctrine of constitutional avoidance to expand a criminal statute's reach. That is because the doctrine of constitutional avoidance presupposes that there is at least some doubt as to the scope of conduct a statute proscribes-to apply the doctrine there must be at least two "competing plausible interpretations of a statutory text."
 
 See
 

 Clark
 
 , 543 U.S. at 381,
 
 125 S.Ct. 716
 
 . Accordingly, applying the doctrine of constitutional avoidance to adopt the more expansive of "competing plausible interpretations" of a criminal statute's reach-as my colleagues in dissent would have us do here-entails
 
 the judiciary
 
 holding unlawful conduct for which there necessarily is some doubt as to whether Congress intended to make the conduct a crime. The Supreme Court, however, has long recognized that the judiciary lacks "the power to define new federal crimes,"
 
 Skilling
 
 ,
 
 561 U.S. at 415
 
 ,
 
 130 S.Ct. 2896
 
 (Scalia, J., dissenting) (citing
 
 United States v. Hudson
 
 ,
 
 7 Cranch 32
 
 , 34,
 
 3 L.Ed. 259
 
 (1812) )-precisely what would occur if a judicial construction of a criminal statute encompasses conduct Congress did not intend to make unlawful.
 

 That certainly is the case here. Given (1) the Supreme Court's long-settled construction of several key terms in Section 924(c)(3)(B) as a compelling application of the ordinary-case categorical approach, (2) the government's decades-long position that the language of Section 924(c)(3)(B) demands application of the ordinary-case categorical approach, and (3) lower federal courts' unanimous determination, prior to
 
 Dimaya
 
 , that the ordinary-case categorical approach applies, there is, at the very least, a strong possibility-indeed, likelihood, as the majority opinion persuasively explains-that Congress
 
 did not
 
 intend for the case-specific approach to apply. Accordingly, my dissenting colleagues' novel application of the doctrine of constitutional avoidance to expand Section 924(c)(3)(B) 's reach by requiring application of the case-specific approach would "arrogat[e],"
 
 post
 
 at 261-62 (Wilkinson, J.), to the judiciary the authority "to define [a] new federal crime,"
 
 Skilling
 
 ,
 
 561 U.S. at 415
 
 ,
 
 130 S.Ct. 2896
 
 (Scalia, J., dissenting).
 

 Not only does applying the doctrine of constitutional avoidance to expand the reach of a criminal statute conflict with Congress's exclusive authority to define crimes and punishments, but it also stands in tension with the rule of lenity, which requires that "any ambiguity over the ... scope [of a criminal statute] be resolved in [a criminal defendant's] favor."
 
 Crandon v. United States
 
 ,
 
 494 U.S. 152
 
 , 168,
 
 110 S.Ct. 997
 
 ,
 
 108 L.Ed.2d 132
 
 (1990). When a court resorts to the doctrine of constitutional avoidance to construe a statute-as my dissenting colleagues would have us do here-it necessarily does so because there is some "ambiguity" as to the statute's reach. Applying the doctrine of constitutional avoidance to
 
 narrow
 
 a criminal statute's scope advances the interests served by the rule of lenity because it resolves the statutory ambiguity in the criminal defendant's favor.
 

 By contrast, applying constitutional avoidance to
 
 widen
 
 a statute's reach fails to keep faith with the rule of lenity because it resolves a statutory ambiguity in a manner contrary to the interests of criminal defendants. Indeed, were the judiciary to rely on constitutional avoidance to interpret a statute's breadth in a manner that extends beyond what the text "clearly warrants"-as necessarily occurs when a court adopts a broad reading of an ambiguous statute-it would violate the due process principle of "fair warning" undergirding
 the rule of lenity.
 
 United States v. Hayes
 
 ,
 
 555 U.S. 415
 
 , 436-37,
 
 129 S.Ct. 1079
 
 ,
 
 172 L.Ed.2d 816
 
 (2009) (Roberts, C.J., dissenting) (quoting
 
 Crandon
 
 ,
 
 494 U.S. at 160
 
 ,
 
 110 S.Ct. 997
 
 ).
 

 III.
 

 My good colleague in dissent asserts that it is the majority's refusal to abandon the ordinary-case categorical approach-rather than the dissenting opinions' unprecedented application of constitutional avoidance to usurp Congress's exclusive authority to define crimes and punishments-that amounts to an "arrogation of authority ... all too prevalent in appellate ranks throughout the country."
 
 Post
 
 at 261 (Wilkinson, J.). As my colleague sees it, this Court's decision to continue to construe Section 924(c)(3)(B) as requiring use of the ordinary-case categorical approach reflects a "troubling trend" of "appellate micro-management"-that by applying the ordinary-case categorical approach this Court is "displac[ing]" the historical roles of "trial courts, juries, and indeed Congress."
 
 Post
 
 at 260-61, 261-62, 263 (Wilkinson, J.).
 

 Whatever the merits of my dissenting colleague's concern about the "appellate regency" subverting the traditional role of trial judges, juries, and Congress in criminal adjudication,
 
 post
 
 at 262-63 (Wilkinson, J.), such concerns have no place in this case. There is no question that this Court's resolution keeps faith with the Supreme Court's longstanding conclusion that when Congress used identical terms in other statutes, it intended for the categorical approach to apply,
 
 see
 

 Taylor
 
 ,
 
 495 U.S. at 601
 
 ,
 
 110 S.Ct. 2143
 
 ,
 
 and
 
 with this Court's conclusion that those terms demand application of the categorical approach in present-offense, as well as past-offense, cases,
 
 see
 

 Fuertes
 
 , 805 F.3d at 498 ;
 
 United States v. Aragon
 
 ,
 
 983 F.2d 1306
 
 , 1312 (4th Cir. 1993). There also can be no question that this Court's resolution of this case adheres to the-until recently unquestioned-decades-long judicial understanding of Section 924(c)(3)(B).
 
 See supra
 
 note 1. And there is no question that this Court's resolution of this case mirrors the construction of Section 924(c)(3)(B) that the government advanced from the statute's adoption until
 
 Dimaya
 
 .
 

 Accordingly, this Court's resolution of this case in no way breaks with the historical understanding of Section 924(c)(3)(B) and the roles of juries and trial courts in applying that statute. Rather, it is the government's post-
 
 Dimaya
 
 about-face as to the proper construction of Section 924(c)(3)(B), and my dissenting colleagues' embrace of that construction, that turns away from the historical understanding and application of that statute. Likewise, my dissenting colleagues' proposed expansion of the doctrine of constitutional avoidance in a manner that empowers the judiciary to "trench upon the legislature's [exclusive] powers" to define crimes and punishments,
 
 Salinas v. United States
 
 ,
 
 522 U.S. 52
 
 , 60-61,
 
 118 S.Ct. 469
 
 ,
 
 139 L.Ed.2d 352
 
 (1997), is the only evidence of a "troubling trend" of "appellate micro-management" that this case provides.
 

 My colleagues in dissent rejoin that surely Congress intended to punish individuals like Defendant-and, possibly, like the defendant in
 
 Benally
 
 -who committed, under the specific facts of their case, what are undisputedly "violent" crimes, as that term is used colloquially.
 
 Post
 
 at 261-62 (Wilkinson, J.);
 
 post
 
 at 272-73 (Richardson, J.). And they are right. That is why Congress has proscribed conspiracy to commit Hobbs Act robbery and involuntary manslaughter, and why Congress has imposed substantial criminal penalties for individuals who commit those crimes. But that is
 not the question we must address. Rather, we are tasked with deciding whether Congress intended to hold Defendant criminally liable for the
 
 additional
 
 offense of using a firearm in commission of an "
 
 offense
 
 " that "
 
 by its nature
 
 , involves a substantial risk that physical force against the person or property of another may be used." § 924(c)(3)(B) (emphases added). And by expressly choosing to render unlawful only those "offenses" that "by [their] nature" involve application of violent force, Congress sought to limit the universe of defendants prosecutable under Section 924(c)(3)(B) to those defendants who commit crimes
 
 the ordinary manifestation of which
 
 "involve[ ] a substantial risk that physical force against the person or property of another may be used."
 

 As the majority opinion ably explains, the Supreme Court long has held that when Congress uses that specific language, it intends for courts to apply the ordinary-case categorical approach. And in accordance with the Supreme Court's construction of that language, the government long has argued-including earlier in this case-that Congress intended for courts to apply the ordinary-case categorical approach in determining whether a defendant is amenable to prosecution under Section 924(c)(3)(B). Put simply, until
 
 Dimaya
 
 , the judiciary and the government agreed that Congress intended for Section 924(c)(3)(B) to require application of the ordinary-case categorical approach, and therefore that Congress did not contemplate prosecuting individuals like Defendant under that provision. Since Congress enacted Section 924(c)(3)(B) in 1986, Congress never has disturbed that settled understanding.
 

 Of course, Congress is free to amend Section 924(c)(3)(B) to permit
 
 further
 
 punishment of Defendant under that provision. But this Court is not free to expand the statute's reach through an unprecedented application of the doctrine of constitutional avoidance,
 
 [3]
 

 see
 

 Clark
 
 , 543 U.S. at 382,
 
 125 S.Ct. 716
 
 (2005) ("[Constitutional avoidance] is thus a means of giving effect to congressional intent, not of subverting it."), particularly in light of the Supreme Court's settled construction of the meaning of Section 924(c)(3)(B) 's key terms,
 
 see
 

 Rodriguez de Quijas v. Shearson/Am. Express, Inc.
 
 ,
 
 490 U.S. 477
 
 , 484,
 
 109 S.Ct. 1917
 
 ,
 
 104 L.Ed.2d 526
 
 (1989) (''[T]he Court of Appeals should ... leav[e] to th[e Supreme
 ] Court the prerogative of overruling its own decisions.'').
 

 IV.
 

 In sum, neither my dissenting colleagues nor the government points to a single case in which the Supreme Court has sanctioned the use of constitutional avoidance in a manner that expands the scope of a criminal statute, as it would if we applied the case-specific approach to Section 924(c)(3)(B). And, for decades, courts-at the government's express invitation-have applied the ordinary-case categorical approach in accordance with the settled understanding of that statute's text. Constitutional avoidance is "not a license for the judiciary to rewrite language enacted by the legislature."
 
 Salinas
 
 ,
 
 522 U.S. at 60-61
 
 ,
 
 118 S.Ct. 469
 
 . But that is precisely what would occur if this Court followed my dissenting colleagues' suggestion and relied on constitutional avoidance to expand Section 924(c)(3)(B) 's reach. Accordingly, any justification for the case-specific approach grounded in constitutional avoidance radically departs from the established scope and application of the doctrine.
 

 The Government does not contend that Simms's plea renders him unable to challenge his § 924(c) conviction. It has expressly disavowed any reliance on the appellate waiver provision in Simms's plea agreement.
 
 See
 
 Gov. Supp. Br. at 4 n.2.
 

 Because § 16(b) and § 924(c)(3)(B) are materially identical, we and other courts have treated "precedent respecting one as controlling analysis of the other."
 
 In re Hubbard
 
 ,
 
 825 F.3d 225
 
 , 230 n.3 (4th Cir. 2016) ;
 
 see also, e.g.
 
 ,
 
 Evans v. Zych
 
 ,
 
 644 F.3d 447
 
 , 452 n.2 (6th Cir. 2011) ("recogniz[ing] essentially identical nature of § 924(c) and § 16" and applying § 16(b) case law to § 924(c)(3)(B) analysis);
 
 United States v. Serafin
 
 ,
 
 562 F.3d 1105
 
 , 1108 n.4 (10th Cir. 2009) ("cases interpreting [§ 16(b) ] inform our analysis" of § 924(c)(3)(B) ). The Government urges us to abandon this approach and reinterpret § 924(c)(3)(B) ; we address its argument in Parts IV-VI of this opinion.
 

 Before
 
 Dimaya
 
 was decided, a panel of the Eleventh Circuit concluded that the § 924(c)(3)(B)"determination [is] more precise" than that under the ACCA residual clause, because § 924(c) requires a " 'nexus' between the ... firearm offense and the predicate crime of violence."
 
 Ovalles v. United States
 
 ,
 
 861 F.3d 1257
 
 , 1265-66 (11th Cir. 2017),
 
 reh'g en banc granted, opinion vacated
 
 ,
 
 889 F.3d 1259
 
 (11th Cir. 2018),
 
 and on reh'g en banc
 
 ,
 
 905 F.3d 1231
 
 (11th Cir. 2018),
 
 and opinion reinstated in part
 
 ,
 
 905 F.3d 1300
 
 (11th Cir. 2018). But this conclusion is premised on a misunderstanding of § 924(c)(3)(B). In defining "crime of violence," the statute directs us to consider what the underlying offense entails "by its nature," not what it entails when committed using a firearm.
 
 18 U.S.C. § 924
 
 (c)(3)(B). Therefore, the firearm "nexus" offers no meaningful guidance on what satisfies the distinct crime of violence element.
 
 See
 

 Salas
 
 , 889 F.3d at 685-86.
 

 Simms frames this as "waiver," which we have defined as "identif[ying] an issue, and then explicitly withdraw[ing] it."
 
 United States v. Robinson
 
 ,
 
 744 F.3d 293
 
 , 298 (4th Cir. 2014) (internal quotation marks omitted). But waiver, in a technical sense, concerns a party's relinquishment of rights before a
 
 district court
 
 ; where a party raises and then knowingly withdraws a claim before the district court, there is no error for us to review.
 
 United States v. Olano
 
 ,
 
 507 U.S. 725
 
 , 733,
 
 113 S.Ct. 1770
 
 ,
 
 123 L.Ed.2d 508
 
 (1993). Because the Government did not raise a conduct-specific argument before the district court, its double-turnabout before us is better treated as abandonment or forfeiture of a claim that we retain discretion to review.
 

 Id.
 

 at 733-34
 
 ,
 
 113 S.Ct. 1770
 
 .
 

 See
 

 United States v. Douglas
 
 ,
 
 907 F.3d 1
 
 , 16 (1st Cir. 2018),
 
 petition for cert. filed
 
 , No. 18-7331 (U.S. Jan. 7, 2019);
 
 Ovalles v. United States
 
 ,
 
 905 F.3d 1231
 
 , 1253 (11th Cir. 2018) (en banc);
 
 United States v. Barrett
 
 ,
 
 903 F.3d 166
 
 , 184 (2d Cir. 2018),
 
 petition for cert. filed
 
 , No. 18-6985 (U.S. Dec. 3, 2018).
 
 But see
 

 Davis
 
 , 903 F.3d at 485 (finding "a suggestion by a minority of justices in [
 
 Dimaya
 
 ]" insufficient to overrule circuit precedent requiring ordinary-case categorical approach);
 
 Eshetu
 
 ,
 
 898 F.3d at 37
 
 (emphasizing that "
 
 Dimaya
 
 nowise calls into question" circuit precedent requiring "a categorical approach");
 
 Salas
 
 , 889 F.3d at 685 (holding § 924(c)(3)(B) unconstitutionally vague),
 
 reh'g and reh'g en banc denied
 
 , No. 16-2170 (May 23, 2018) (denying Government's petition for rehearing on constitutional avoidance grounds).
 

 Nor do any of the courts of appeals that have embraced a conduct-specific approach. For example, while the First Circuit found it "plausible that 'by its nature' refers to the real-world conduct of a particular offense," it did not consider the surplusage problem that this interpretation creates.
 
 Douglas
 
 ,
 
 907 F.3d at 8
 
 .
 

 The Government responds by citing the phrase "
 
 during and in relation to
 
 any crime of violence,"
 
 18 U.S.C. § 924
 
 (c)(1)(A) (emphasis added), to argue for a conduct-specific reading of "crime of violence." The argument fails. In fact, it is not unusual to describe specific conduct or circumstances (like use of a firearm) "in relation to" a categorically defined generic offense (like a crime of violence). For example, in prosecutions under the force clause, § 924(c)(1)(A) itself refers to specific conduct (use of a firearm) "during and in relation to" a generic offense (a categorically defined crime of violence). In § 924(c) prosecutions where the predicate offense is a "drug trafficking crime" rather than a "crime of violence," § 924(c)(1)(A) again refers to specific conduct "during and in relation to" a categorically defined crime. Congress has utilized an analogous approach in other statutes that incorporate the categorical "crime of violence" definition in § 16.
 
 See, e.g.
 
 ,
 
 18 U.S.C. § 929
 
 (a)(2) (criminalizing use of armor-piercing ammunition "during and in relation to the commission of a crime of violence");
 
 18 U.S.C. § 1956
 
 (a)(3) (imposing criminal penalties for "conduct[ing] a financial transaction involving property ... used to conduct or facilitate" a crime of violence);
 
 18 U.S.C. § 25
 
 (b) (multiplying maximum sentence for adult who "intentionally uses a minor to commit a [federal] crime of violence"). And the Supreme Court has similarly interpreted a misdemeanor domestic violence statute to require a circumstance-specific analysis of whether a crime was "committed by" an offender with a "specified domestic relationship" to the victim, and a categorical analysis as to whether the crime requires force as an element.
 
 United States v. Hayes
 
 ,
 
 555 U.S. 415
 
 , 426,
 
 129 S.Ct. 1079
 
 ,
 
 172 L.Ed.2d 816
 
 (2009).
 

 Compare
 

 18 U.S.C. § 924
 
 (c)(3) ("offense that is a felony and[ ] ... that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense"),
 
 with
 

 18 U.S.C. § 16
 
 (b) ("offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense").
 

 Comprehensive Crime Control Act, Pub. L. No. 98-473, tit. II, § 1005(a),
 
 98 Stat. 1976
 
 , 2138-39 (1984) (amending § 924(c) to reference "crime[s] of violence," as defined in new § 16 );
 

 id.
 

 § 1001, 98 Stat. at 2136 (enacting § 16 );
 
 see also id.
 
 §§ 1801-03, 98 Stat. at 2185 (enacting ACCA). Congress enacted § 924(c)(3)(B) two years later, adopting wording materially identical to § 16(b). Firearm Owners' Protection Act, Pub. L. No. 99-308, § 104,
 
 100 Stat. 449
 
 , 456-59 (1986).
 

 Despite the foregoing analysis, Judge Richardson maintains that we "rewrite[ ] history" to "claim[ ] that the Supreme Court has already resolved this issue." Of course, we claim no such thing. Perhaps our colleague only means to assert that our conclusions accord with the reasoning of four Justices interpreting materially identical text mere months ago, as well as the indication of the Chief Justice; to that assertion, we readily agree.
 

 The Government also suggests that "Sixth Amendment concerns ... led to the categorical approach" in ACCA and § 16(b) because conduct-specific interpretations of those statutes would require judicial fact-finding at sentencing, an issue that § 924(c)(3)(B) does not present. Gov. Supp. Br. at 20. In fact, non-sentencing applications of § 16(b) -including its incorporation into the immigration statute reviewed in both
 
 Leocal
 
 and
 
 Dimaya
 
 -similarly present no Sixth Amendment concerns. Moreover, even more fundamental constitutional values militate against a conduct-specific approach here. For where Congress has spoken so plainly, judicially revising its work would threaten the basic structural principle of separation of powers.
 
 See, e.g.
 
 ,
 
 Lewis v. City of Chicago
 
 ,
 
 560 U.S. 205
 
 , 215,
 
 130 S.Ct. 2191
 
 ,
 
 176 L.Ed.2d 967
 
 (2010) ("It is not for us to rewrite the statute ... to achieve what we think Congress really intended.").
 

 Judge Wilkinson contends that we "derogat[e] the fact-finding function" of trial courts in a purported "arrogation of authority." Far from it. We honor the difficult work of our colleagues on the trial courts by eliminating the need to waste time and energy interpreting an unconstitutional statute. Our holding rests not on a lack of respect for the excellent hard work of district judges, but on the inability of
 
 this
 
 court to rewrite an unambiguous congressional directive.
 

 See, e.g.
 
 ,
 
 United States v. Taylor
 
 ,
 
 814 F.3d 340
 
 , 377 (6th Cir. 2016) ("Section 924(c)(3)(B)... does not allow a court to consider risk-related conduct beyond that which is an element of the predicate crime," because "[t]he phrase 'by its nature' indicates that a court's analysis ... is confined to the offense itself.");
 
 United States v. Fuertes
 
 ,
 
 805 F.3d 485
 
 , 498-99 (4th Cir. 2015) (applying categorical approach under § 924(c)(3)(B) );
 
 United States v. McGuire
 
 ,
 
 706 F.3d 1333
 
 , 1336-37 (11th Cir. 2013) ("We employ this categorical approach because of the statute's terms: It asks whether [the defendant] committed 'an offense' that ... '
 
 by its nature
 
 , involves a substantial risk that physical force against the person or property of another may be used.' "),
 
 overruled in
 

 Ovalles
 
 , 905 F.3d at 1253 ;
 
 United States v. Acosta
 
 ,
 
 470 F.3d 132
 
 , 134-37 (2d Cir. 2006) (applying categorical approach under § 924(c)(3)(B) ),
 
 overruled in
 

 Barrett
 
 , 903 F.3d at 178 ;
 
 United States v. Munro
 
 ,
 
 394 F.3d 865
 
 , 870-71 (10th Cir. 2005) (explaining that § 924(c)(3)(B) determination is a "legal conclusion" and applying categorical analysis);
 
 United States v. Jennings
 
 ,
 
 195 F.3d 795
 
 , 797-98 (5th Cir. 1999) (stating that use of "by its nature" in § 924(c)(3)(B)"requires courts to determine whether an offense constitutes a crime of violence without examining the underlying facts surrounding the conviction" (internal quotation marks omitted) );
 
 United States v. Kennedy
 
 ,
 
 133 F.3d 53
 
 , 56-57 (D.C Cir. 1998) (under § 924(c)(3)(B), "the question is whether the crime with which [appellant] was charged constituted a ... crime of violence" under a "categorical approach" (internal quotation marks omitted) );
 
 United States v. Amparo
 
 ,
 
 68 F.3d 1222
 
 , 1225-26 (9th Cir. 1995) ("[A]pplication of a categorical approach to section 924(c)(3)(B) is required by our cases.");
 
 United States v. Moore
 
 ,
 
 38 F.3d 977
 
 , 979 (8th Cir. 1994) (emphasizing reference to "by its nature" in § 924(c)(3)(B) and holding that "[t]o determine the nature of a crime requires an examination of the elements which compose it, ... not ... an exploration of the underlying facts"),
 
 abrogation on other grounds recognized
 
 ,
 
 United States v. Torres-Villalobos
 
 ,
 
 487 F.3d 607
 
 , 616 (8th Cir. 2007).
 

 See, e.g.
 
 ,
 
 Jobson v. Ashcroft
 
 ,
 
 326 F.3d 367
 
 , 372 (2d Cir. 2003) (deeming the categorical approach "not only consistent with precedent and sound policy," but "also necessary in view of the language of" § 16(b) (internal quotation marks omitted) );
 
 Aragon
 
 ,
 
 983 F.2d at 1313
 
 ("[T]he plain language of § 16(b) mandates that the court embark upon a categorical approach to determine whether a particular crime, 'by its nature,' qualifies as a 'crime of violence.' ").
 

 Judge Richardson's puzzling invocation of Justice Kavanaugh's scholarship only underscores this point. Far from endorsing the unprecedented application of constitutional avoidance that Judge Richardson champions, then-Judge Kavanaugh warned
 
 against
 
 overreliance on this canon and others triggered by a threshold finding of ambiguity. Brett Kavanaugh,
 
 Fixing Statutory Interpretation
 
 , 129 HARV. L. REV. 2118, 2144 (2016) (book review). Thus, he proposed "jettison[ing]" constitutional avoidance and instead allowing judges to first "determine the best reading of the statute" and then, "[i]f that reading turn[s] out to be unconstitutional," "say as much."
 
 Id.
 
 at 2148. Of course, we lack the power to follow this approach and, in any event, a faithful employment of the constitutional avoidance canon compels the result we reach.
 

 Justice Story later explained that if a
 

 section admits of two interpretations, one of which brings it within, and the other presses it beyond the constitutional authority of congress, it will become our duty to adopt the former construction; because a presumption never ought to be indulged, that congress meant to exercise or usurp any unconstitutional authority, unless that conclusion is forced upon the Court by language altogether unambiguous.
 

 United States v. Coombs
 
 , 37 U.S. (12 Pet.) 72, 76,
 
 9 L.Ed. 1004
 
 (1838) ;
 
 see also
 

 Blodgett v. Holden
 
 ,
 
 275 U.S. 142
 
 , 148,
 
 48 S.Ct. 105
 
 ,
 
 72 L.Ed. 206
 
 (1927) (Holmes, J., concurring) ("[A]s between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, [a court's] plain duty is to adopt that which will save the Act.").
 

 The requirement that a court adopt a plausible interpretation to avoid striking down a statute as unconstitutional is sometimes referred to as the presumption of validity or the unconstitutionality canon. It is related to the more recent, and arguably weaker, "doubts" canon, which urges courts to adopt plausible interpretations of statutes to avoid having to contemplate difficult constitutional questions.
 
 See
 

 United States ex rel. Attorney General v. Delaware & Hudson Co.
 
 ,
 
 213 U.S. 366
 
 , 408,
 
 29 S.Ct. 527
 
 ,
 
 53 L.Ed. 836
 
 (1909) ;
 
 see also
 

 Jennings v. Rodriguez
 
 , --- U.S. ----,
 
 138 S.Ct. 830
 
 , 836,
 
 200 L.Ed.2d 122
 
 (2018). For a discussion of these two principles, see Adrian Vermeule,
 
 Saving Constructions
 
 , 85 GEO. L.J. 1945, 1948-50 (1997).
 

 I agree with much of Judge Niemeyer's fine opinion finding that the proper construction of the residual clause requires looking to Simms's actual conduct. In my view, however, the duty to adopt a saving construction obviates the need to identify the best reading, requiring us to determine only whether a fairly possible reading permits looking to Simms's actual conduct.
 
 See
 
 Ante at 272-73 (Niemeyer, J., dissenting) (noting in the alternative that the constitutional avoidance doctrine would apply if there were any doubt about the proper construction).