**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-4069**

UNITED STATES OF AMERICA,

               Plaintiff – Appellee,

      v.

TROY ALLEN LUCAS, a/k/a Troy Madron,

               Defendant – Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore.
Roger W. Titus, Senior District Judge. (1:16-cr-00284-RWT-1)

Argued: May 18, 2020                           Decided: December 4, 2020

Before THACKER and RICHARDSON, Circuit Judges, and Kenneth D. BELL, United
States District Judge for the Western District of North Carolina, sitting by designation.

Affirmed by unpublished opinion. Judge Richardson wrote the opinion, in which Judge
Thacker and Judge Bell joined.

**ARGUED:** Mary Elizabeth Davis, DAVIS & DAVIS, Washington, D.C., for Appellant.
Sandra Wilkinson, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore,
Maryland, for Appellee. **ON BRIEF:** Christopher M. Davis, DAVIS & DAVIS,
Washington, D.C., for Appellant. Robert Hur, United States Attorney, Martin J. Clarke,
Assistant United States Attorney, Jake Goodman, Student Law Clerk, OFFICE OF THE
UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

RICHARDSON, Circuit Judge:

In 2008, Baltimore City Police wrongfully pinned the murder of Rob Long on Demetrius Smith. And a local jury convicted him based on the testimony of two witnesses. He served four years of a life sentence before federal investigators uncovered evidence that led to his release. That federal investigation revealed that Long's demise resulted from a remarkable scheme to stop Long's cooperation in an investigation of Jose Morales for theft. Just days after learning from his lawyer that Long was cooperating in the theft investigation, Morales hired Troy Lucas to kill Long. Federal authorities convicted Morales of murder in 2013, and with Morales' cooperation, federal efforts turned to Lucas. Lucas was then convicted by a federal jury for his involvement in the murder-for-hire plot.

Lucas appeals, claiming the district court erred in excluding the testimony of a deceased witness who had testified at Smith's trial. He also argues that murder-for-hire is not a crime of violence under the force clause of 18 U.S.C. § 924(c). We affirm.

## I.    Background

On a March 2008 morning, Rob Long was shot twice in the head near Traci Atkins Park in Baltimore, Maryland. He died from gunshots that came from no "more than two feet away." J.A. 997. Although Long was seen alone with Lucas fifteen minutes before the murder, the authorities charged Smith for Long's murder.

In 2010, a jury in Baltimore City convicted Smith based largely on the testimony of two alleged eyewitnesses: Michelle Vicker and Mark Bartlett. Bartlett, now deceased, testified that he saw Smith shoot Long while standing at the corner across from the park. Bartlett claimed that around 7:30am he saw Smith "reach[] in his jacket and pull[] out a

2

handgun and aim[] it at Mr. Long's head." J.A. 78. While video evidence from a pole camera at the scene contradicted Bartlett's testimony that he saw the murder, Smith's counsel failed to address this evidence on Bartlett's cross-examination. Instead, Smith's counsel agreed to a stipulation that the video's stated time was inaccurate. Smith was convicted and sentenced to life in prison.

Five months after Long's murder, law enforcement caught Morales in Texas with six kilograms of cocaine, which led a federal jury to convict him of drug trafficking. Once incarcerated on those charges, Morales provided information to prison officials about Long's murder. This information led to a federal investigation that revealed that Morales and Lucas—not Smith—had murdered Long.

Long, it turns out, had agreed to cooperate with law enforcement just before he was murdered. He cooperated against his longtime employer, Morales, in a state theft case. Using the information Long provided, law enforcement obtained a search warrant for Morales' home, where they located stolen goods. Morales then contacted his attorney, Stanley Needleman, "irritated" and "very upset" about the search warrant. J.A. 138. In that discussion, Morales speculated that Long must have been the informant. Morales demanded that Needleman find out if Long was cooperating with law enforcement. Based on the Assistant State's Attorney's refusal to provide any information about the informant, Needleman began to suspect that Long was the informant. He confirmed that suspicion through Long's own attorney, Alex Leikus, who gave away his client. Needleman relayed this information to Morales, who became "enraged." J.A. 139. Long was murdered two days later.

3

Based on the federal investigation, Morales was convicted and sentenced to life in prison for Long's murder. *See United States v. Morales*, 585 F. App'x 176 (4th Cir. 2014). And state prosecutors requested that Smith's conviction—which was still on appeal—be vacated. Smith's conviction was finally expunged in March 2016, six years after he had been wrongfully convicted.

That left Lucas, whom Morales had hired to kill Long. In 2018, a federal jury convicted Lucas based on Morales' testimony[1] and corroboration from witnesses, a street-security camera, phone records, and statements Lucas had made to law enforcement. Lucas was convicted on all three counts charged in the indictment: conspiring to commit murder-for-hire resulting in death, using an interstate-commerce facility in the commission of murder-for-hire conspiracy resulting in death, and using a firearm during a crime of violence resulting in death. The district court sentenced Lucas to life in prison. Lucas now appeals the exclusion of testimony from a deceased witness and the conclusion that murder-for-hire is a crime of violence under the force clause of 18 U.S.C. § 924(c).

---

[1] Morales testified that his original idea was for Lucas "to shoot [Long] up with some cocaine and make it look like he [overdosed]." J.A. 414–15. But if that plan failed, Lucas explained that he could use the "small chrome pistol" he had shown to Morales just days before the murder to kill Long instead. J.A. 415. Seeing the gun was sufficient confirmation for Morales to pay Lucas $2,000 of the total $4,000 they had agreed upon for Lucas to carry out the murder. *See* J.A. 416. Morales paid Lucas the remaining balance upon receiving a call from Lucas the morning of March 24, 2008, confirming that "[the murder] was finished, it was done." J.A. 432. When he collected the cash from Morales, Lucas told him that "[h]e shot [Long] in the back of the head, and [Long] spun around, and then he shot him in the front." J.A. 439.

## II.    Discussion

### A.    Exclusion of hearsay testimony

During his trial, Lucas sought to introduce the transcript of Bartlett's testimony from Smith's trial.  In the trial that led to Smith's wrongful conviction, Bartlett had testified that he saw Smith shoot Long.  The district court refused to admit Bartlett's testimony under the residual exception to the rule against hearsay, Rule 807.  Lucas challenges this ruling. We review for an abuse of discretion.  *See United States v. Shaw*, 69 F.3d 1249, 1254−55 (4th Cir. 1995).[2]

The hallmark of Federal Rule of Evidence 807 is that the hearsay statement sought to be admitted is trustworthy.  Though the rule was meaningfully amended in 2019, the Rule in effect at the time of Lucas' trial permitted the admission of hearsay that was not otherwise admissible if:

(1) the statement has equivalent circumstantial guarantees of trustworthiness;

(2) it is offered as evidence of a material fact;

(3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

(4) admitting it will best serve the purposes of these rules and the interests of justice.

---

[2] Lucas also argued below that the prior testimony should be admissible under Rule 804(b)(1), which permits former testimony when the declarant is unavailable under specific circumstances.  But Lucas has waived that argument on appeal, as he did not raise it in his opening brief. *IGEN Intern., Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 308 (4th Cir. 2003).

Fed. R. Evid. 807 (2017).[3]

Interpreting this version of Rule 807, we have held that a court should not rely on "other evidence offered" at trial—rather than the circumstances of the hearsay statement itself—when evaluating whether the statement contains sufficient guarantees of trustworthiness. *Shaw*, 69 F.3d at 1253 n.5.[4] Instead, a court should consider the "'totality of the circumstances that surround the making of the statement,'" in determining whether the statement has a "ring of reliability about it." *United States v. Clarke*, 2 F.3d 81, 84–85 (4th Cir. 1993) (citing *Idaho v. Wright*, 497 U.S. 805, 822 (1990)). "This trustworthiness requirement [] serves as a surrogate for the declarant's in-court cross-examination." *Shaw*, 69 F.3d at 1253 (citing *Wright*, 497 U.S. at 820).

---

[3] The 2019 amendment to Rule 807 requires judging a statement's trustworthiness based on the totality of the circumstances, including corroborating evidence:

> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

> (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

*See* Fed. R. Evid. 807 (2019).

[4] In *Shaw*, this discussion stemmed from our analysis of whether the prosecution's introduction of hearsay testimony violated the Confrontation Clause. *Shaw*, 69 F.3d at 1253. But the inquiry into trustworthiness under Rule 807 "aligns with the inquiry demanded by the Confrontation Clause," *United States v. Clarke*, 2 F.3d 81, 84 (4th Cir. 1993) (citing *Idaho v. Wright*, 497 U.S. 805, 822 (1990)), so we may rely on *Shaw* here.

In *Shaw*, Shaw's co-defendant was convicted based, in part, on the prior testimony of two witnesses who died before Shaw's trial. *Id.* at 1251. We affirmed the district court's decision to admit transcripts of the witnesses' prior testimony at Shaw's trial. We considered whether the statements were "made under circumstances that guaranteed their trustworthiness such that cross-examination would have been of marginal utility in testing their accuracy." *Id.* at 1253. Emphasizing that both witnesses had been robustly cross-examined and their inconsistencies vetted during their prior testimony, we found that added cross-examination at Shaw's trial would have been of only "marginal utility." *Id.* at 1254–55; *see also United States v. Bumpass*, 60 F.3d 1099, 1102 (4th Cir. 1995) (sufficient guarantees of trustworthiness for a statement offered under Federal Rule of Evidence 804(b)(3) are established when "cross examination would add little to test the hearsay's reliability"). The marginal utility of further cross-examination coupled with the witnesses' disincentive to lie at the first trial led us to find the statements to be sufficiently trustworthy. *Shaw*, 69 F.3d at 1254.

Unlike *Shaw*, the district court here found that Bartlett's testimony in Smith's trial was given under circumstances that lacked the type of cross-examination and vetting that would guarantee the testimony's trustworthiness. J.A. 217. The district court found that the quality of Smith's counsel's cross-examination fell short of the representation required to guarantee the trustworthiness of Bartlett's testimony. As a result of defense counsel's poor performance, cross-examination of Bartlett in Lucas' trial would have been "vastly different and more extensive" had Bartlett been able to testify in person. J.A. 217; *see also* J.A. 218 ("[T]here would have been a vastly different and far more searching and far-

7

reaching cross-examination than took place in the proceedings in [the Smith case].").  We agree.

Lucas argues that the district court erred by considering inconsistencies and contradictory evidence to evaluate the trustworthiness of Bartlett's prior testimony.  But we find that the district court's analysis, focusing on the failure of Smith's counsel to conduct an effective cross-examination with the available information, focused correctly on the "circumstances of the deceased witnesses' statements" and not on "other corroborating evidence in the record."  *Shaw*, 69 F.3d at 1253 n.5.  In *Shaw*, we considered in our trustworthiness analysis the "vigorous" questioning the witnesses endured on cross-examination and that the defendant's counsel "took full advantage of his opportunity to cross-examine" the later-deceased witnesses.  *Id.* at 1254.  The district court here similarly considered whether Smith's counsel effectively cross-examined Bartlett and reasonably concluded he did not.  The contradicting evidence did not determine that Bartlett's testimony was untrustworthy.  Instead, the district court's holding relied on Smith's counsel's *failure to address* the contradicting evidence during Bartlett's cross examination.  While contradicting evidence may not be directly relied on to show untrustworthiness, counsel's failure to address such evidence is an appropriate consideration.  *Id.* at 1253 n.5, 1254.

The district court properly considered that Bartlett's testimony was given before a judge and under oath rather than in an informal setting.  But given "the totality of the circumstances," the district court determined that the testimony did not possess a sufficient guarantee of trustworthiness.  Without the assurance that Bartlett was properly cross-

examined and vetted in the prior trial leading to an inference of untrustworthiness, we are placed in precisely the position the hearsay rules are designed to guard against. Thus, we find no basis for concluding that the district court's determination was an abuse of discretion.[5]

### B.      Section 924(c) crime of violence

Lucas' § 924(c) conviction was predicated on two offenses: conspiracy to use interstate commerce facilities to commit murder for hire resulting in death under 18 U.S.C. § 1958(a)[6] and use of interstate commerce facilities in the commission of murder for hire resulting in death, also under 18 U.S.C. § 1958(a). Lucas argues that neither of these predicate offenses qualify as "crime[s] of violence" under § 924(c)'s force clause.[7] We disagree.

---

[5] Finding no abuse of discretion, we need not wade into the government's alternative arguments about Rule 403 and harmless error. *Cf. United States v. Castner*, 50 F.3d 1267, 1272 (4th Cir. 1995).

[6] "Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any *facility of interstate or foreign commerce*, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, *anything of pecuniary value*, or who *conspires* to do so, shall be fined under this title or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined under this title or imprisoned for not more than twenty years, or both; and if *death results*, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both." 18 U.S.C. § 1958(a) (emphasis added).

[7] Both parties agree that after the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), neither predicate qualifies as a crime of violence under the residual clause of § 924(c).

We determine de novo whether an offense qualifies as a crime of violence. *United States v. Evans*, 848 F.3d 242, 245 (4th Cir. 2017). To qualify as a "crime of violence" under § 924(c)'s force clause, the charged offense must have as an element the use, attempted use, or threatened use of "physical force." § 924(c)(3)(A). "Physical force" means "*violent* force"—that is, "strong physical force" that is "capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010) (emphasis in original).

We first consider the method under which we conduct this inquiry. The Supreme Court adopted the categorical approach as one method of determining whether an offense qualifies as a "crime of violence." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1211 (2018). In applying the categorical approach, we "look only to the statutory definitions – *i.e.*, the elements – of a defendant's [offense] and not to the particular facts underlying [the offense]" to determine whether the offense qualifies as a crime of violence. *Descamps v. United States*, 570 U.S. 254, 261 (2013) (cleaned up); *United States v. Royal*, 731 F.3d 333, 341−42 (4th Cir. 2013). However, this process is frustrated when the statute the defendant is charged under is divisible. This is so because a divisible statute "lists 'potential offense elements in the alternative,' and thus includes 'multiple, alternative versions of the crime,'" *United States v. Bryant*, 949 F.3d 168, 173 (4th Cir. 2020) (quoting *Descamps*, 570 U.S. at 260) (emphasis omitted), "render[ing] opaque which element played a part in the defendant's conviction," *Descamps*, 570 U.S. at 260. When a statute is divisible, we apply the modified categorical approach, which permits us to "examine a limited set of documents, such as 'the indictment, jury instructions, or plea agreement and

10

colloquy,'" to remedy the opaqueness and determine "'which of the statute's alternative elements formed the basis of the defendant's prior conviction.'" *Bryant*, 949 F.3d at 173 (first quoting *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016); then quoting *Descamps*, 570 U.S. at 262). Once we determine the precise offense of conviction, we apply the above-mentioned traditional categorical approach to determine whether that offense qualifies as a crime of violence under § 924(c)'s force clause. *Id.*

Section § 1958(a) is a divisible statute: one version of the offense requires the government to prove as an element of the crime that "death result[ed]" from its commission and carries a punishment of death or life imprisonment, while the other version does not include a death-resulting element and provides a maximum sentence of twenty years. *See* § 1958(a); *see also Mathis*, 136 S. Ct. at 2256 ("If statutory alternatives carry different punishments, then under *Apprendi* they must be elements."); *United States v. Tsarnaev*¸ 968 F.3d 24, 104–05 (1st Cir. 2020) (finding a statute "divisible into two branches: one in which there is no 'death results' element (and the penalty is up to life in prison), and one in which there is a 'death results' element (and the penalty can be death)"). Counts 1 and 2 of the indictment charged Lucas with the "death results" offense. *See* J.A. 13 ("which offense resulted in the death of Robert Long"); J.A. 14 (same). So we consider the crime-of-violence question as it pertains to the "death results" offense under § 1958(a).

We look first to the conspiracy charged in Count 1. A conspiracy does not generally qualify as a crime of violence because it requires "only that the defendant agreed with another to commit actions that, if realized, would violate the [substantive crime of violence]. Such an agreement does not invariably require the actual, attempted, or

11

threatened use of physical force." *United States v. Simms*, 914 F.3d 229, 233–34 (4th Cir. 2019) (en banc). But where the actor's conviction "require[d] knowing conduct that cause[d] bodily injury to another, [it] categorically involve[d] the 'use' of 'violent force.'" *United States v. Allred*, 942 F.3d 641, 655 (4th Cir. 2019). Our precedent is clear that "a crime requiring the 'intentional causation' of injury requires the use of physical force." *United States v. Battle*, 927 F.3d 160, 166 (4th Cir. 2019) (quoting *United States v. Castleman*, 572 U.S. 157, 170 (2014)); *see also Castleman*, 572 U.S. at 170 ("It is impossible to cause bodily injury without applying force in the common-law sense."); *In re Irby*, 858 F.3d 231, 236 (4th Cir. 2017); *Tsarnaev*, 968 F.3d at 104–05. By requiring that death result from the defendant's conspiracy when the defendant has the "intent that a murder be committed," the charged conspiracy offense under § 1958(a) requires the "use of physical force," § 924(c)(1)(A), and thus is a crime of violence. *See Tsarnaev¸*968 F.3d at 104-05.

Our outcome on the predicate offense charged in Count 2—the substantive crime of using interstate commerce facilities in the commission of murder-for-hire—is dictated by the same analysis.[8] As a result, we hold that either of Lucas' § 1958(a) convictions properly qualified as predicate crimes of violence to sustain Lucas' § 924(c) conviction.[9]

---

[8] And our conclusion on this count is bolstered by *United States v. Luskin*, 926 F.2d 372, 379 (4th Cir. 1991). In that case, we held that the offense contained within the former version of 18 U.S.C. § 1958 was a crime of violence under both the force and residual clauses of § 924(c). *Id.* at 379 n.3.

[9] Lucas also argues that the evidence failed to support the jury's guilty verdict because Morales did not adequately identify Lucas at trial and there was no evidence that (Continued)

12

\*       \*       \*

The district court did not abuse its discretion in preventing the introduction of essentially unchallenged testimony from a trial that led to a wrongful conviction. Nor did the district court err in finding that Lucas' § 1958(a) offenses qualify as crimes of violence under 924(c). Accordingly, the judgment of the district court is

AFFIRMED.

---

Lucas used an interstate-commerce facility to facilitate Long's murder. Reviewing these claims de novo but viewing the evidence and making reasonable inferences in the light most favorable to the government, we find more than sufficient evidence to support the verdict. *See* J.A. 392 (Morales identifying Lucas in the courtroom); J.A. 431–34 (Morales' testimony about making phone calls during the commission of the offense); J.A. 1052, 1056, 1058–62 (phone records showing calls).